919 P.2d 294

STATE of Hawai'i, By Margery S. BRON-
STER, Attorney General,[1] Plaintiff–Ap-
pellant/Cross–Appellee,

v.

UNITED STATES STEEL COR-
PORATION, Defendant–Ap-
pellee/Cross–Appellant,

and

Erkel Greenfield and Associates, Inc.;
Charles Luckman; Samuel M. Burnett;
The Luckman Partnership, Inc.; former-
ly known as Charles Luckman And As-
sociates; Dillingham Corporation, dba
Hawaiian Dredging And Construction
Company, Inc.; Inryco, Inc.; formerly
known as Inland Ryerson Company,
Inc.; Hawai'i Welding Co., Ltd.; Diver-
sified Earth Sciences, Inc.; Mountain
States Steel Company, Inc., aka Emes-
sessco, Inc., Mitsui & Co. (U.S.A.), Inc.;
Bethlehem Steel Corporation; Kaiser
Steel Corporation; Nippon Steel
(U.S.A.), Inc.; Nippon Steel Corporation;
Riedel International, Inc., fka William-
ette Western Corporation; Severud, Per-
rone, Sturm, Conlin And Bandel, aka
Severud, Perrone, Szegezdy & Strum;
The Ogden Corporation; Mitsui & Co.,
Ltd.; Rudy Veland; Michael T. Suzuki;
Michael T. Suzuki & Associates, Inc.;
Argonaut Insurance Company; Charles
Shumsky; John Does 4–100; Mary Roes
1–100; Doe Partnerships 2–100; and Doe
Corporations 9–100; Defendants.

HAWAI'I WELDING CO., LTD.,
Third–Party Plaintiff,

v.

GENERAL INSURANCE COMPANY OF
AMERICA, Third–Party Defendant.

No. 17695.

Supreme Court of Hawai'i.

June 24, 1996.

---

1. This action was originally instituted on behalf of the state of Hawai'i by then-state attorney general Tany Hong on June 22, 1982. Over the fourteen-year life of the case, Hong was succeeded by several other attorneys general. Pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c)(1), the current attorney general, Margery S. Bronster, has been substituted automatically for Hong as representing the plaintiff in the present case.

Robert A. Marks, Former Attorney General, and Girard D. Lau and Peter L. Yee, Deputy Attorneys General, and David J. Dezzani and Wayne A. Muraoka of Goodsill, Anderson, Quinn & Stifel, Special Deputy Attorneys General, on the briefs, Honolulu, for Plaintiff–Appellant/Cross–Appellee State of Hawai'i.

Richard R. Clifton and Milton M. Yasunaga of Cades, Schutte, Fleming & Wright, Honolulu, and Tony Berman of Berman Paley Goldstein & Kannry, New York City, pro hac vice, and John M. Rochefort and David S. MacCuish of McClintock, Weston, Benshoof, Roschfort Rubalcava & MacCuish, Los Angeles, Cal., pro hac vice, on the briefs, for Defendant–Appellee/Cross–Appellant United States Steel Corporation.

Before MOON, C.J., and LEVINSON, NAKAYAMA and RAMIL, JJ., and MILKS, Circuit Judge, in place of KLEIN, J., recused.

MOON, Chief Justice.

In this case, dealing with the rusting steel structure of O'ahu's Aloha Stadium, plaintiff-appellant/cross-appellee State of Hawai'i (state) appeals from the judgment, after a jury trial, entered in favor of defendant-appellee/cross-appellant United States Steel Corporation (USX, USS, or U.S. Steel). On appeal, the state argues that: (1) the circuit court erred in granting USX's motion to dismiss its negligent misrepresentation claim on the basis that the claim was barred by the "economic loss" rule; (2) the trial court's jury instructions regarding the state's unfair and deceptive trade practices claim were erroneous; and (3) USX's alleged failure to turn

over requested documents during discovery warrant the grant of a new trial. In addition, USX cross appeals from the trial court's denial of its motion for attorneys' fees.

For the following reasons, we hold that: (1) the "economic loss" rule does not bar the state's negligent misrepresentation claim; (2) the trial court's jury instructions regarding the state's claim for unfair or deceptive acts or practices in the conduct of any trade or commerce erroneously stated the law; and (3) the state waived any claim of discovery abuse by not raising the issue at trial. We therefore vacate the circuit court's grant of USX's motion to dismiss, vacate the judgment in favor of USX as to the state's claim for unfair or deceptive acts or practices in the conduct of any trade or commerce, and remand this case for further proceedings. In view of our remand, we need not reach USX's cross appeal. The judgment of the trial court is affirmed in all other respects.

## I. *BACKGROUND*

In 1966, the City and County of Honolulu (the City) decided to build a multi-purpose sports stadium in Halawa. The City budgeted the stadium project at $25,000,000.00 and was particularly desirous of a design that would be able to accommodate both football and baseball. The City solicited design proposals from various architectural firms, and the firm that was eventually awarded the bid, Charles Luckman Associates (CLA),[2] proposed building a stadium with movable stands that could be positioned in both football and baseball configurations. However, because a movable stand design required a structure constructed of a material lighter and more flexible than concrete, a central feature of CLA's proposed design was that the stadium be constructed of steel.

Through USX's advertising and the personal experience of Rudy Veland, CLA's chief designer for the stadium project, CLA became aware of a product generically referred in the steel industry as "weathering steel," a type of steel designed to be used in an unpainted condition in appropriate circumstances. Ideally, when exposed to the

normal wetting and drying cycles of the atmosphere, weathering steel would form a patina of rust that allegedly would protect the steel from further corrosion. USX marketed its brand of weathering steel, which was known as "Cor–Ten," as being four times as resistant to corrosion as ordinary carbon steel.

CLA investigated the propriety of using weathering steel for the stadium project and received letters from steel companies, including USX, expressing favorable opinions regarding the propriety of using weathering steel in the stadium project. In a letter to Veland, dated October 1, 1968, Frank E. Felix, USX's construction industry representative, wrote:

In response to your request to our Mr. G. Tupac earlier this month, we are pleased to have the opportunity to comment on the suitability of the use of exposed structural Cor–Ten steel on the new Municipal Stadium in Honolulu.

It is our understanding that the projects [sic] building site is located about one thousand (1000) feet from Pearl Harbor, with prevailing winds blowing from inland and that the harbor has very little wave action. Your information to us also indicated that the minimum temperature of the area is about 68°F and the average rainfall is approximately forty (40) inches per year.

Our experience and research indicates that unpainted Cor–Ten will perform satisfactorily when exposed in the environment described above and, specifically, airborne salt will not pose a problem since the harbor has little wave action and prevailing winds are from inland.

We therefore recommend that it would be most appropriate for you to continue to consider this excellent application for bare USS Cor–Ten steel.

Based on our past relationship with you, we know you have a full understanding and appreciation of the design characteristics and requirements of this product; however, we would like to confirm our offer to provide you and your client full benefit of our past experience and extensive research

2. CLA was subsequently known as "the Luckman Partnership."

in the exposed application of Cor–Ten as your design of Honolulu Municipal Stadium progresses through it's [sic] final stage as well as through the fabrication and construction phases of the project.

Thank you for your inquiry and if we can be of any further assistance in regards to this subject or any other matter, please don't hesitate to call on us.

Subsequently, in an internal USX memorandum to F.T. Comee, USX's construction marketing regional manager, Felix wrote:

During the last several weeks, G. Tupac and the writer have been involved in efforts to direct Charles Luckman Associates towards an all steel structure on the above captioned project [the stadium] and, in particular, an exposed Cor–Ten steel design. Our activities, together with Luckman's intense desire to do a Cor–Ten job, has resulted in a preliminary Cor–Ten specification for the stadium requiring approx 5500 tons of Cor–Ten structural shapes, plate and decking.

Earlier this month, we had requested the ARL [applied research lab] give their comments relative to the suitability of exposed Cor–Ten in the Honolulu area based on climatical data provided to us by the architect. Our comments to Luckman, based on Mr. D.J. Carney's letters of September 19, 1968 is attached.

On October 1, I met with Mr. Rudy Veland, Ass't Director of Design for Luckman, who expressed that it would be most beneficial to his firm and important to our mutual interest if we would provide him with a letter signed by an executive of USS for purpose of the prestige that it would lend and that, in addition to having the same content of my letter. Veland requested it also include an offer to have one of our qualified representatives personally visit the building site to confirm its suitability for exposed Cor–Ten and that we also offer to give a presentation of Cor–Ten to Mr. Tsutomu Izumi, Building Supervisor for the City and County of Honolulu. Veland specifically requested that this presentation be the same one that we gave to his client (Dillingham Corporation)

on the Wilshire West Plaza project here in Los Angeles a few months ago.

Veland went on to explain that he could than [sic] forward this letter to Mr. Izumi and thereby have facility to recommend and arrange a USS meeting with his client. It is my recommendation that we seriously consider honoring Luckman's request, and in light of Mr. Paddock's personal relationship with Luckman, that his signature on the subject letter would be most appropriate, assuming, of course, that he feels this effort on our part is warranted.

USX's favorable opinions regarding the use of Cor–Ten in the stadium project were thereafter echoed in another letter to Veland dated October 11, 1968, from D.J. Carney, USX's vice-president in charge of applied research, which provided:

Recently, Frank Felix of our Los Angeles Construction Marketing Office asked us to comment on the suitability of using unpainted USS COR–TEN steel for the proposed Municipal Stadium in Honolulu, Hawaii. It is our understanding the stadium site is about 1,000 feet from Pearl Harbor in an atmospheric environment containing no industrial pollutants. In addition, we have been advised that the minimum temperature is about 68 F, and the average rainfall is 40 inches per year.

One of our principal concerns ordinarily would be exposure to salt air; however, it is our understanding there is very little wave action in the harbor and the prevailing winds blow toward the water. Moreover, rainfall would tend to wash off any salt deposits on the steel that might result from occasional severe storms. In view of these conditions, airborne salts would not be a problem. We would, however, appreciate the opportunity of reviewing the drawings of the stadium so that possible staining problems with other materials or spectators might be identified and avoided.

As you might imagine, we in U.S. Steel would very much like to see COR–TEN steel used for this outstanding construction project. If you believe a personal visit to the project site by a qualified U.S. Steel representative would be helpful in confirming the suitability of using exposed COR–

TEN for this application, we will be happy to make the necessary arrangements. If you decide such a visit might be worthwhile, possibly a COR–TEN presentation to Mr. Tsutomu Izumi, building supervisor for the City and County of Honolulu, might also be appropriate.

We are hopeful this discussion will be helpful in establishing that the use of unpainted COR–TEN steel is appropriate for the Municipal Stadium in Honolulu. Please do not hesitate to contact us if there is anything additional you might require from us.

The City subsequently approved CLA's design and proposal to use weathering steel in the structure of the stadium.

Responsibility for the stadium project was later transferred to the state, and the Aloha Stadium was eventually constructed under the state's auspices. Throughout its involvement with the project, the state continued to use CLA as its architect.

Thereafter, the stadium began to rust. Rather than merely forming a "protective" patina, the corrosion worsened over time to a point where it began to impair the structural integrity of the stadium. The state then filed the present action against numerous defendants, including USX, raising various theories of recovery, including various forms of negligence, negligent misrepresentation, unfair or deceptive acts or practices in the conduct of any commerce or trade, breach of express and implied warranties, vicarious liability, enterprise liability, and common-law fraud. The state eventually settled with all parties except USX, and the case proceeded to trial in July 1993.

Prior to trial, the circuit court granted USX's motion to dismiss the state's tort claims, holding:

The Court rules that where a seller or a manufacturer of a product negligently misrepresents the qualities, performance characteristics, or capabilities of the product, and the product fails to perform according to those representations, resulting in economic damages only, the seller may not be held liable in tort. To rule otherwise would be unduly restrictive of commerce, research and development, economic com-

petition, and the roots of a free enterprise system. However, if a seller or manufacturer intentionally misrepresents or engages in fraud or deceit in representing the qualities, performance characteristics, or capabilities of a product and the product fails to perform accordingly causing economic damages only, the seller may be liable.

Construing the State's allegations of negligent misrepresentation in the light most favorable to it, the State cannot prevail on its negligent misrepresentation claim against defendant USX. Therefore, the motion is granted.

The only claims remaining for trial, therefore, were the causes of action based on breach of warranties, common law fraud, and unfair and deceptive trade acts or practices. Prior to submission of the case to the jury, the state withdrew its claims for breach of warranties, and the jury returned a verdict in favor of USX on the two remaining claims.

Thereafter, USX brought a motion for attorneys' fees, which the trial court denied, holding that "absent a specific statute, judicial decision, or agreement, a litigant may not recover attorneys' fees against the State."

The state then timely appealed from the adverse judgment, and USX timely cross-appealed from the trial court's denial of its motion for award of attorneys' fees.

## II. *DISCUSSION*

### A. *The State's Appeal*

### 1. The Circuit Court's Dismissal of the State's Negligent Misrepresentation Claim

#### a. *Standard of Review.*

■■■ Although USX's motion, prompting the order dismissing the state's negligent misrepresentation claim, was styled as a motion to dismiss, the motion was brought pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 56, relating to summary judgment. Even if we were to consider the motion as a HRCP Rule 12 motion to dismiss, HRCP Rule 12(c) provides in pertinent part that:

If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Voluminous supporting materials were presented in support of USX's motion, and the materials were not excluded by the court. We therefore treat USX's "motion to dismiss" as seeking summary judgment pursuant to HRCP Rule 56, and, accordingly, apply the standard of review applicable to motions for summary judgment. It is well settled that:

We review [a] circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated,

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law.

*Id.* (emphasis added) (citation and internal quotation marks omitted); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

*Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995).

b. *The "Economic Loss" Rule Should Not Bar Actions Based on Negligent Misrepresentation, Even Where A Manufacturer Makes Purported Misrepresentations Regarding Its Product.*

USX argues that the circuit court properly granted its motion to dismiss the state's tort claims based on what has been termed the "economic loss" rule: that a cause of action in products liability will not lie where a plaintiff alleges a purely economic loss stemming from injury only to the product itself. The state, on the other hand, argues that the circuit court erred in applying the "economic loss" rule to bar its negligent misrepresentation claim against USX because the claim is not based on a products liability theory. We agree.

In *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the United States Supreme Court acknowledged the "economic loss" rule, effectively adopted the rationale of the California Supreme Court in *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), and held that no products liability claim lies in admiralty when a commercial purchaser alleges injury only to the product itself, resulting in purely economic loss. In *East River*, a shipbuilder contracted with Transamerica to design, manufacture, and supervise the installation of turbines that would be the main propulsion units for four oil-transporting supertankers constructed by the shipbuilder. After each ship was completed, it was chartered to one of the petitioners. When the ships were put into service, the turbines on all four ships malfunctioned due to design and manufacturing defects. Only the products themselves were damaged. The petitioners filed suit against Transamerica, alleging causes of action sounding in products liability, seeking damages for the cost of repairing the ships and for income lost while the ships were out of service. The district court granted summary judgment in favor of Transamerica, and the court of appeals affirmed, holding that the petitioner's dissatisfaction with product quality did not state a claim cognizable in tort.

The United States Supreme Court affirmed the circuit court, holding that a manufacturer in a commercial relationship has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself. The high court noted:

"The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his [or her] products." *Seely v. White Motor Co.*, 63 Cal.2d [9,] 18, 45 Cal.Rptr. [17,] 23, 403 P.2d [145,] 151 [ (1965) ]. When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.

The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the "cost of an injury and the loss of time or health may be an overwhelming misfortune," and one the person is not prepared to meet. *Escola v. Coca Cola Bottling Co. [of Fresno]*, 24 Cal.2d [453,] 462, 150 P.2d [436,] 441 [ (1944) ] (opinion concurring in judgment). In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service. Losses like these can be insured. *See* 10A G. Couch, Cyclopedia of Insurance Law §§ 42:385–42:401, 42:414–417 (2d ed. 1982); 7 E. Benedict, Admiralty, Form No. 1.16–7, p. 1–239 (7th ed.1985); 5A J. Appleman & J. Appleman, Insurance Law & Practice § 3252 (1970). Society need not presume that a customer needs special protection. The increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified. *Cf. United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (C.A.2 1947).

Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value." *See* J. White and R. Summers, Uniform Commercial Code 406 (2d ed.1980). The

maintenance of product value and quality is precisely the purpose of express and implied warranties. *See* UCC § 2–313 (express warranty), § 2–314 (implied warranty of merchantability), and § 2–315 (warranty of fitness for a particular purpose). Therefore, a claim of a nonworking product can be brought as a breach-of-warranty action. Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract. *See* UCC §§ 2–601, 2–608, 2–612.

*Id.* at 871–72, 106 S.Ct. at 2302–03 (footnote omitted).

■ The "economic loss" doctrine is accepted by a majority of jurisdictions that have had occasion to consider it, *see* 4A *American Law of Products Liability*, §§ 60:36—60:60 (3d ed.1991 and Supp.1995); Annotation, *Strict Products Liability: Recovery for Damage to Product Alone*, 72 A.L.R.4th 12 (1985 and Supp.1995), and we take this opportunity to adopt it insofar as it applies to claims for relief based on a product liability or negligent design and/or manufacture theory.

■ However, this is not to say that we must apply the doctrine in the present case. The state argues that, although the damages sought by the state are admittedly purely economic, the cause of action founded on negligent misrepresentation is not precluded by the economic loss doctrine because the claim does not sound in products liability. We agree for three principal reasons.

First, the tort of negligent misrepresentation is founded on the breach of a duty separate and distinct from the duty abolished by the economic loss rule. In *Chun v. Park*, 51 Haw. 462, 462 P.2d 905 (1969), we adopted the tort of negligent misrepresentation in a case brought by purchasers of property and their lenders, involving the sellers' title company's negligent failure to report a recorded second mortgage on the property being purchased by the purchasers, and held that:

It is true that the order for the certificate [of title] was placed by a real estate broker representing the sellers; however, the order also informed the defendant that the plaintiffs were the buyers and that the

Honolulu Savings and Loan Association was the lending institution.

The trial court found that the certificate of title search would be relied upon not only by the sellers, but also by the purchasers (plaintiffs) and the Honolulu Savings and Loan Association; and that in reliance of the certificate, the Honolulu Savings and Loan Association did make the loan to plaintiffs and plaintiffs did purchase the premises, accepting a warranty deed.

Thus, under the record of this case, we find no difficulty in imposing a duty and we hold that defendant title company owed plaintiffs a duty to use reasonable care in making the search and in the preparation of the certificate of title search for the premises.

We believe that it would be contrary to the rule of fair play to hold that the defendant company did not owe the Honolulu Savings and Loan Association and the plaintiffs a duty to use reasonable or ordinary care in the preparation of the certificate of title search because the very purpose of the document was to show to both of them, as well as the seller, that the seller had good marketable title, free and clear of all encumbrances.

*Id.* at 464–65, 462 P.2d at 906–07 (footnote omitted). In so holding, the *Chun* court adopted the formulation of the tort of negligent misrepresentation as ultimately[3] framed by Restatement (Second) of Torts § 552 (1977) (section 552), which provides in pertinent part:

Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his [or her] business, profession or employment, or in any other transaction in which he [or she] has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he [or she] fails to exercise

reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he [or she] intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he [or she] intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transaction in which it is intended to protect them.

*Id. See also Shaffer v. Earl Thacker Co.,* 6 Haw.App. 188, 716 P.2d 163 (1986) (applying Restatement position).

The duty imposed by section 552 is therefore to exercise reasonable care or competence in obtaining or communicating information for the guidance of others in their business transactions. This duty, however, is distinct from the duty eliminated by the economic loss rule. As noted by the court in *East River,* the economic loss rule absolves manufacturers in commercial relationships from a duty "under either a negligence or strict products-liability theory to prevent a product from injuring itself." 476 U.S. at 871, 106 S.Ct. at 2302. Utilization of the economic loss rule to dismiss a claim for negligent misrepresentation, therefore, would be incongruous.

The Supreme Court of Tennessee, in *John Martin Co. v. Morse/Diesel, Inc.,* 819 S.W.2d 428 (Tenn.1991), offered an especially lucid discussion of the distinction between a claim for economic loss based on a cause of action sounding in negligent misrepresentation and a claim for economic loss based on a cause of action sounding in products liability. In

---

**3.** The *Chun* court actually relied upon the 1966 Tentative Draft No. 12 of section 552. The version relied upon by the *Chun* court, however, is identical to the version as ultimately published in 1977, as quoted *infra.*

*John Martin*, a subcontractor brought an action against a construction manager and on-site superintendent, alleging that the construction manager negligently approved shop drawings that reflected an insufficient amount of concrete to construct the project's superstructure to the specified elevation. On summary judgment, the defendant construction manager argued that the economic loss rule precluded the plaintiff's action, and the trial court granted the motion. The court of appeals reversed, and the Supreme Court of Tennessee affirmed, noting:

> The defendant's principal argument is that the plaintiff cannot recover on a theory of negligence because any losses were purely commercial in nature. It contends that principles of negligence should not be applied to contract-based interests....
>
> ....
>
> *This is not a products liability case. In this instance, the theory of recovery is that the defendant negligently supplied information intended for the guidance of others; the plaintiff relied upon the misrepresentation in the performance of his contracted service and experienced business losses as a result.* Many of those cases relied upon by the defendant involve claims of product liability in respect to design defects; the losses suffered were caused by defective products, not misguidance or misdirection in the performance of services. *See, e.g., MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916). The question here is not one of harm to person or property, but of economic loss.

*Id.* at 430–31 (emphasis added). Similarly, in the present case, as to the negligent misrepresentation claim, the state does not seek to recover economic losses stemming from a claim that USX was negligent in designing or manufacturing the steel. Rather, the recovery sought stems from a claim that USX did not exercise reasonable care or competence in obtaining or communicating information for the guidance of the state in its decision regarding the steel to be used in the construction of the stadium, namely, that weathering steel was appropriate for use in the stadium project, given the proposed location

for the stadium and the weather conditions of the proposed location. In other words, relative to the negligent misrepresentation claim, the state seeks damages not for USX's acts or omissions in its design or manufacture of weathering steel, but for USX's actions and/or omissions in its promotions, recommendations, investigations and/or opinions regarding the use of weathering steel.

■ Second, both section 552, and this court in *Chun*, recognize that pecuniary losses are recoverable in a claim for negligent misrepresentation. Section 552(1) expressly states that liability will attach "for *pecuniary loss* caused ... by [plaintiff's] justifiable reliance upon the information[.]" *See also* Restatement (Second) of Torts § 311, comment a (1965) (distinguishing section 552, noting that "[t]he rule stated in this Section represents a somewhat broader liability than the rules stated as to liability for *pecuniary loss* resulting from negligent misrepresentation, stated in § 552, to which reference should be made for comparison" (emphasis added)). Citing section 552, the *Chun* court affirmed the award of "out-of-pocket expenses," including the purchasers' cash down payment, mortgage payments, financing charges, real property and gross income taxes, insurance expenses, and the expenses associated with obtaining plans, specifications, and a permit for a new building.

These points have also been recognized in other jurisdictions. For example, in *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Management*, 87 Ohio App.3d 613, 622 N.E.2d 1093 (1993), the Ohio Court of Appeals noted:

> [T]hose courts which apply the economic loss rule to bar recovery in tort claims for negligent misrepresentation fail to take into account the express wording of Section 552, which provides that "one who, ... in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information ..." The above strict and narrow interpretation of the tort of negligent misrepresentation fails to take into account

those circumstances where the supplier of false information has a pecuniary interest in the transaction at hand and also fails to realize that "pecuniary loss" is by its very definition "economic loss." *See* Black's Law Dictionary (6 Ed.1990) 1131; *see, also, Harrell* [*v. Crystal* ], 81 Ohio App.3d [515,] 523, 611 N.E.2d [908,] 913 [ (Ohio 1992) ], recognizing recovery for pecuniary damages.

*Id.* 622 N.E.2d at 1105–06 (ellipses in original).

Similarly, in *Vermont Plastics, Inc. v. Brine, Inc.*, 824 F.Supp. 444 (D.Vt.1993), the United States District Court for the District of Vermont, applying Vermont law, which recognizes section 552, rejected an argument that purely economic damages are not recoverable for negligent misrepresentation and noted:

First, as indicated above [referencing text of section 552(1) ], the Restatement allows for any pecuniary loss suffered by a party relying on the misrepresentation. Second, in *Kramer v. Chabot,* 152 Vt. 53, 564 A.2d 292 (1989), the Vermont Supreme Court allowed a plaintiff to recover for purely economic damages under a negligent misrepresentation theory. The court allowed the plaintiff to recover the benefit of her bargain for losses that she suffered in purchasing a house which was worth considerably less money than represented to her by an independent appraiser. *Id.* at 58, 564 A.2d at 294–95. Therefore, under the Restatement and under Vermont law, a plaintiff can recover contract-type damages—or in other words, purely economic damages—for the tort of negligent misrepresentation.

*Id.* at 451–52 (footnote omitted). *See also Advanced Drainage Systems, Inc. v. Lowman,* 210 Ga.App. 731, 437 S.E.2d 604, 607 (1993) (recognizing section 552 as an "exception" to the economic loss rule); *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 452 (1982) (recognizing that economic loss is recoverable for intentional and negligent misrepresentation, but not innocent misrepresentation).

Finally, one of the principal considerations enunciated by courts adopting the economic loss rule is that permitting recovery of economic losses in a claim based on products liability would undermine provisions of the Uniform Commercial Code (UCC). However, such consideration is not applicable to actions based on negligent misrepresentation because the UCC itself contemplates actions based on misrepresentation.

The logic and policy considerations supporting the adoption of the economic loss rule in the products liability context are compelling. As the court in *East River* noted:

Products liability grew out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty. *See Seely v. White Motor Co.,* 63 Cal.2d 9, 15, 45 Cal.Rptr. 17, 21, 403 P.2d 145, 149 (1965). It is clear, however, that *if this development were allowed to progress too far, contract law would drown in a sea of tort. See* G. Gilmore, The Death of Contract 87–94 (1974).

476 U.S. at 866, 106 S.Ct. at 2299–2300 (emphasis added). Representative of the reasoning utilized by courts adopting the economic loss rule are the comments of the Oklahoma Supreme Court in *Waggoner v. Town & Country Mobile Homes, Inc.,* 808 P.2d 649 (Okla.1990). Explaining why economic damages should not be recoverable in a products liability action, the *Waggoner* court first delineated the distinction between the type of damage sought to be remedied by products liability and the type of damage sought to be remedied by the UCC:

A product can cause personal injury, property damage, and economic loss. Recovery, under the doctrine of manufacturers' products liability, is allowed for personal injury, ... and damage to property other than damage to the product itself. ... This Court has yet to address the question of whether manufacturers' products liability applies to purely economic damages resulting from product deterioration. The question is one of the proper relationship between the Uniform Commercial Code (UCC) and manufacturers' products liability.

An action in manufacturers' products liability is primarily tortious in nature. Its

rationale is founded upon public interest in human safety.... This liability is independent of UCC warranty provisions because recovery under manufacturers' products liability arises from a duty to the public rather than from a contractual relationship. Thus, the parties to a sales contract may not limit a manufacturer's liability for personal injury caused by a product defect.

Recovery under warranty provisions, however, applies to losses flowing from the sales contract. Comment 4 to section 2–313 of the UCC notes that "the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell." Section 2–314 provides that "[u]nless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." ...

As to damages recoverable in a warranty action, section 2–714 of the UCC provides in part:

> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

> (3) In a proper case any incidental and consequential damages under the next section may also be recovered.

Consequential damages are defined is section 2–715(2)(b) to include "injury to person or property resulting from any breach of warranty."

*Id.* at 652 (citations, internal quotation marks, and footnotes omitted).

Analyzing why, in the case of damage only to the product itself, remedies in products liability and contract should not overlap, the *Waggoner* court stated:

> [A]s to personal injury or injury to other property, manufacturers' products liability and the UCC warranty provisions provide parallel remedies. But as to damage only to the product itself, the two remedies dramatically diverge.

> This Court has long held that manufacturers' products liability should be distinguished from contractual liability. "While the UCC does envision allowing recovery for personal injury and for property damage arising out of defectively manufactured articles, such recovery arises out of contractual relationships, express or implied...." This contractual relationship, the sales contract, is also the basis for the recovery of a buyer's economic losses.

> In contrast, "[t]he economic expectations of parties have not traditionally been protected by the law concerning unintentional torts." These expectations have been safeguarded by commercial law principles. Therefore, economic damages are more logically related to the UCC than to manufacturers' products liability.

> *There is no need to extend manufacturers' products liability into an area already occupied by the UCC. To extend manufacturers' products liability to include purely economic losses would undermine the UCC's "comprehensive and finely tuned statutory mechanism for dealing with the rights of parties to a sales transaction with respect to economic losses." The judicial adoption of manufacturers' products liability in Oklahoma was never intended to replace the statutory provisions of the UCC. Its adoption signaled the end of warranty defenses, such as lack of privity and warranty disclaimers, when a product causes personal injury or damage to other property. But when purely economic losses are caused by a product, the economic expectations of the buyer are protected by the UCC.*

*Id.* at 652–53 (citations omitted and emphasis added).

However, although this reasoning is sound in the case of the overlap between products liability and contract—in that actions sounding in products liability were not intended to remedy purely pecuniary economic losses which are already recoverable in contract—the same is not true of available damages in actions founded on negligent misrepresentation. As previously discussed, section 552

expressly contemplates the recovery of purely pecuniary losses in an action based on negligent misrepresentation.

Moreover, and perhaps most importantly, the UCC itself contemplates actions based on misrepresentation. Section 1–103 of Hawai'i's version of the UCC expressly provides that

> [u]nless displaced by the particular provisions of this chapter, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, *misrepresentation*, duress, coercion, mistake, bankruptcy, or other validating. or invalidating cause shall supplement its provisions.

HRS § 490:1–103 (1993) (emphasis added). Similarly, section 2–721 provides:

> *Remedies for material misrepresentation or fraud include all remedies available under this Article for nonfraudulent breach.* Neither rescission or a claim for rescission of the contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy.

HRS § 490:2–721 (1993) (emphasis added). *See also Coastal Group v. Dryvit Systems,* 274 N.J.Super. 171, 643 A.2d 649, 652 (App. Div.1994) (holding trial court erred in holding that economic loss rule precluded plaintiff's claim for fraud and misrepresentation, citing sections 1–103 and 2–721 of New Jersey's version of the UCC).

For the foregoing reasons, we hold that: (1) the economic loss rule applies to bar recovery of pure economic loss in actions based on products liability; (2) the economic loss rule does not bar actions based on negligent misrepresentation or fraud; and (3) the circuit court therefore erred in dismissing the state's negligent misrepresentation claim against USX based on the economic loss rule.

c. *Negligent Misrepresentation Actions Based on Section 552 of the Restatement Are Not Limited to Parties Whose Business it Is to Supply Information For the Guidance of Others.*

Alternatively, USX argues that, even if the economic loss rule does not operate to bar the state's negligent misrepresentation claim, actions based on section 552 should be limited to parties whose business is to supply information for the guidance of others. We disagree for three reasons.

i. **plain reading and commentary**

First, section 552 does not expressly provide that its provisions apply only to those "who are in the business of supplying information for the guidance of others." Section 552(1) instead requires only that the provider of information supply information "in the course of his [or her] business, profession or employment," *or* supply information in connection with "any other transaction in which he [or she] has a pecuniary interest." As the commentary to section 552 notes, the salient characteristic required of the defendant supplier of information is that the defendant have a pecuniary interest in the supplying of the information; a showing that the information was supplied in the course of the defendant's business, profession, or employment is sufficient to establish that the defendant has a pecuniary interest in the transaction, but it is only one way of meeting the requirement. The commentary to section 552(1) provides that:

> The rule stated in Subsection (1) applies only when the defendant has a pecuniary interest in the transaction in which the information is given. If he [or she] has no pecuniary interest and the information is given purely gratuitously, he [or she] is under no duty to exercise reasonable care and competence in giving it. . . .
>
> . . . .
>
> The defendant's pecuniary interest in supplying the information will normally lie in a consideration paid to him [or her] for it or paid in a transaction in the course of and as a part of which it is supplied. It may, however, be of a more indirect character. Thus the officers of a corporation, although they receive no personal consideration for giving information concerning its affairs, may have a pecuniary interest in its transactions, since they stand to profit indirectly from them, and an agent who expects to receive a commission on a

sale may have such an interest in it although he [or] she sells nothing.

The fact that the information is given in the course of the defendant's business, profession or employment is a sufficient indication that he [or she] has a pecuniary interest in it, even though he [or she] receives no consideration for it at the time. It is not, however, conclusive. But when one who is engaged in a business or profession steps entirely outside of it, as when an attorney gives a casual and offhand opinion on a point of law to a friend whom he [or she] meets on the street, or what is commonly called a "curbstone opinion," it is not to be regarded as given in the course of his [or her] business or profession; and since he [or she] has no other interest in it, it is considered purely gratuitous. The recipient of the information is not justified in expecting that his [or her] informant will exercise the care and skill that is necessary to insure a correct opinion and is only justified in expecting that the opinion will be an honest one.

Restatement (Second) of Torts § 552, comments c and d (1977).

In other words, the central principle operating within section 552 is that the defendant supplier of information must have a pecuniary interest in the transaction or context in which the information is supplied in order to merit the imposition of a duty of care in obtaining and communicating the information. To this end, section 552 sets out two methods of meeting this requirement. The information may be supplied by one whose business it is to provide information—such as accountants, attorneys or title companies, who provide information for a price, and for the guidance of others in their transactions with third parties. This means of meeting the "pecuniary interest" requirement is contemplated by the "in the course of his [or her] business, profession or employment" language of section 552.

However, section 552 also contemplates the meeting of the "pecuniary interest" requirement by a second, simpler means: the defendant otherwise has an actual pecuniary interest in the transaction in which he or she supplies the information. Hence the provision for applicability "in any other transaction in which [the defendant] has a pecuniary interest." The "in the course of his [or her] business, profession or employment" means satisfies the "pecuniary interest" requirement by a presumption that, if a defendant supplier of information supplies information in the course of his or her business, profession, or employment, the defendant necessarily has a pecuniary interest in the transaction. By contrast, the "other transaction in which [the defendant] has a pecuniary interest" means is satisfied simply when the defendant actually has a pecuniary interest in the transaction. By these two means, section 552 effectively collects within its scope all suppliers of information who possess a pecuniary interest in a transaction in which they supply information for the guidance of others, whether they profit directly from providing the information, or whether they profit indirectly, by the consummation of a transaction in which they have a direct pecuniary interest.

Therefore, the "in the course of his [or her] business, profession or employment" language does not constitute an implicit requirement that all defendant suppliers of information be in the business of supplying information. They must merely profit by supplying the information. To read section 552 as requiring all defendant suppliers of information to be in the business of supplying information would effectively render superfluous the phrase "or in any other transaction in which [the defendant] has a pecuniary interest" and imprudently ignore the focus emphasized by the commentary.

### ii. the rationales used in case law from other jurisdictions cited by USX in support of its position are flawed

Second, the reading of section 552 urged by USX finds support in only one jurisdiction, and the development of the reading of section 552 in that jurisdiction does not indicate a cogent rationale supporting the reading. As previously indicated, in *Moorman*, the Illinois Supreme Court held that the economic loss doctrine does not apply to actions based on intentional and negligent

misrepresentation. The *Moorman* court, however, specifically held that:

> As discussed above, the UCC provides the proper framework for a purchaser's recovery of economic losses. Allowing an aggrieved party to recover under a negligence theory for solely economic loss would constitute an unwarranted infringement upon the scheme provided by the UCC. We have already concluded that plaintiff, in this case, has suffered solely economic loss. Consequently, it cannot recover damages under a negligence theory.
>
> This court has held that economic loss is recoverable where one intentionally makes false representations (*Soules v. General Motors Corp.* (1980), 79 Ill.2d 282, 37 Ill. Dec. 597, 402 N.E.2d 599), *and where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations* (*Rozny v. Marnul* (1969), 43 Ill.2d 54, 250 N.E.2d 656). Neither of these cases, however, implied that economic loss was recoverable for innocent misrepresentation.

*Moorman*, 61 Ill.Dec. 746, 435 N.E.2d at 452 (emphasis added). Although *Rozny v. Marnul*—the case relied upon by the *Moorman* court for the proposition that a cause of action founded on negligent misrepresentation that is exempt from the economic loss rule is limited to those situations where the defendant is in the business of supplying information—concerned the misrepresentations of a surveyor, who could be considered to be in the business of supplying information for the guidance of others, *Rozny* does not explicitly hold that the applicability of section 552 is limited to those in the business of supplying information. *Rozny* does not even speak to the status of the defendant and instead holds that:

> It is apparent that many of the courts which have considered analogous situations have thought the potential liability of one who negligently supplies inaccurate information to be such as to militate against imposing liability when the person ultimately damaged was one whose reliance on the information might have been called "foreseeable", ... but have been willing to impose liability when the reliance of the third person might have been said to be "known".... Although the absence of privity may have been the stated reason for denying liability, it seems likely that the virtually unlimited and unknown potential responsibility of the defendant weighed heavily in the courts' thinking.
>
> ....
>
> We agree that the unknown and unlimited liability factor ... is not to be lightly discounted....
>
> Moreover, we believe the proposed revision of the Restatement (Second) of Torts, § 552, (Tent.Draft.No. 12, 1966), is apposite in this situation. While the draft has not yet been adopted, it apparently recognizes liability to a nebulous group whose reliance on the survey was something more than foreseeable but something less than identifiably known. In the case before us the fact that those who subsequently dealt with the property would rely on the plat was not only foreseeable, it was, by defendant's own testimony, known to him.

250 N.E.2d at 661–63 (citations omitted). *Moorman*, therefore, appears to represent the first injection of an "in the business of supplying information" requirement into section 552 and does not provide any cogent analysis explaining why it has done so.

A second, apparently independent rationale has also been discussed in Illinois decisions regarding the "in the business of supplying information" requirement. In *Penrod v. Merrill Lynch, Pierce, Fenner & Smith,* 68 Ill.App.3d 75, 24 Ill.Dec. 464, 385 N.E.2d 376 (1979), the Appellate Court of Illinois relied upon the Pennsylvania Supreme Court's reasoning in *Renn v. Provident Trust Co.,* 328 Pa. 481, 196 A. 8 (1938), and concluded that, *"[i]f it is one's business to supply information* and if that information is negligently supplied, especially where the person supplying the information knows that some action will be influenced by the information, the supplier of the information can be held liable for the resultant damages." *Id.* 24 Ill.Dec. at 469, 385 N.E.2d at 381 (emphasis added). The *Renn* court rationale, however, relied on section 552 of the

*first* Restatement of Torts, which provided in pertinent part:

> One who in the course of his [or her] business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon the information if
>
> (a) he [or she] fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting[.]

Restatement (First) of Torts § 552 (1938). Noticeably absent from the First Restatement's version of section 552 is the language "or in any other transaction in which [the defendant] has a pecuniary interest" immediately following the phrase "in the course of his [or her] business or profession," as in the Second Restatement's version of section 552. Subsequent Illinois decisions, both pre- and post-Second Restatement, have continued to apply this requirement gleaned from the First Restatement's version of section 552. *See, e.g., Guaranty Bank and Trust Company v. Reyna,* 51 Ill.App.2d 412, 201 N.E.2d 144 (1964); *Citizens Savings and Loan Ass'n v. Fischer,* 67 Ill.App.2d 315, 214 N.E.2d 612 (1966); *Penrod,* 24 Ill.Dec. 464, 385 N.E.2d at 381.

Nor have the Illinois decisions since *Penrod* and *Moorman* offered any analysis of the "in the business of supplying information" requirement, or questioned the continuing efficacy of the requirement in view of the advent of the Second Restatement's version of section 552. Representative of these decisions is *Black, Jackson & Simmons Ins. Brokerage, Inc. v. International Business Machines Corp.,* 109 Ill.App.3d 132, 64 Ill. Dec. 730, 440 N.E.2d 282 (1982), where the court held:

> *Moorman* ... enumerate[s] certain exceptions to the general rule prohibiting recovery of economic losses in tort, and it is one of these exceptions which forms the basis for the plaintiff's argument on appeal. The *Moorman* court stated that "economic loss is recoverable where one intentionally makes false representations (*Soules v. General Motors Corp.* (1980), 79 Ill.2d 282, 37 Ill.Dec. 597, 402 N.E.2d 599) *and where*

> *one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations* (*Rozny v. Marnul* (1969), 43 Ill.2d 54, 250 N.E.[2d] 656)." (*Moorman* at 88–89, 61 Ill.Dec. 746, 435 N.E.2d at 452.) The plaintiff argues that its cause of action is based upon negligent misrepresentation and therefore falls within the second above-quoted exception to the *Moorman* rule.

In addressing the merits of this argument, it is helpful to examine the situations in which Illinois law has been considered concerning recovery of economic losses in a tort action. For the most part, the cases have relied upon the Restatement (Second) of Torts, section 552 which is entitled "Information Negligently Supplied for the Guidance of Others." [ (Quoting the Second Restatement's version of section 552.) ]

... The *Penrod* court construed section 552 as meaning that *"[i]f it is one's business to supply information* and if that information is negligently supplied ... the supplier can be liable for the resultant damages." This construction of the tort was followed in *National Can Corp. v. Whittaker Corp.* (N.D.Ill.1981), 505 F.Supp. 147. In *National Can,* the plaintiff, a manufacturer of bottle caps, sued a supplier of compounds used in making the caps based upon negligent misrepresentations concerning the fitness of the compounds. The court held that although an action for negligent misrepresentation is recognized in Illinois, such suits are limited to situations involving one who in the course of his [or her] business or profession supplies information for the guidance of others in their business relations with *third parties.* The Illinois Supreme Court in the *Moorman* case confirmed the interpretation of negligent misrepresentation espoused in *Penrod* and *National Can* by specifically limiting the recovery of economic losses in negligent misrepresentation actions to situations in which *"one who is in the business of supplying information for the guidance of others in their business transaction makes negligent representations."*

In the context of this case, there are two significant features. First, the defendant must supply the information in the course of his [or her] business, and second, the information must be supplied for the guidance of others in their business transactions. **While section 552 of the second Restatement of Torts says that liability arises when one "in the course of his [or her] business" supplies false information for the guidance of others,** *Moorman* **and** *Penrod* **have construed that section to mean that the defendant must be in the business of supplying information.** Neither of the defendants in the case at bar was in the business of supplying information.

*Id.* 64 Ill.Dec. at 731–32, 440 N.E.2d at 283–84 (underlined emphases in original, bold emphasis added, and some citations omitted). Neither rationale, therefore, whether based on *Moorman* or *Penrod,* is particularly compelling, and we decline to apply them to our interpretation of section 552.

iii. **section 552 reaches suppliers of information whose information affects transactions to which they are parties, as well as suppliers of information whose information affects others' transactions with third parties**

Finally, although the rationale utilized by the United States District Court for the Northern District of Illinois in its *National Can* decision, cited in *Penrod,* that section 552 applies only "in situations where information was supplied that damaged a plaintiff in its relations with *third parties* [,]" 505 F.Supp. at 150 (emphasis in original), is differently worded than the rationale utilized by the Illinois state courts, it is equally flawed.

The *National Can* decision provides in pertinent part:

National Can seeks to escape the force of this uniform body of law [*i.e.* the economic loss rule] by characterizing its claim as one under the tort of negligent misrepresentation, recognized in *Rozny v. Marnul,* . . . and Restatement (Second) of Torts § 552. If the Court may be pardoned a bad pun, National Can is seeking to put new wine into old bottles.

Restatement § 552, as well as the Illinois case law National Can seeks to rely on, deals with an essentially different kind of situation from that involved here. Section 552 imposes liability for detrimental reliance upon "one who in the course of his business or profession supplies information for the guidance of others in their business transactions." That tort has been recognized almost exclusively in situations where information was supplied that damaged a plaintiff in its relations with *third parties, see* Green, *The Duty to Give Accurate Information,* 12 U.C.L.A. L.Rev. 464 (1965).

505 F.Supp. at 150 (emphasis in original). This rationale, however, is directly controverted by illustration 4 to section 552, which provides that:

A, having lots for sale, negligently supplies misinformation concerning the lots to a real estate board, for the purpose of having the information incorporated in the board's multiple listing of available lots, which is distributed by the board to approximately 1,000 prospective purchasers of land each month. The listing is sent by the board to B, and in reliance upon the misinformation B purchases one of A's lots and in consequence suffers pecuniary loss. A is subject to liability to B.

Restatement (Second) of Torts § 552, comment on subsection (2), illustration 4 (1977). As is evident from the illustration, wherein A is liable to B, section 552 was intended to apply to direct transactions between sellers and purchasers as well as those involving third parties. Although it may be true that the bulk of decisions stem from factual situations involving damage stemming from a recipient of information's transactions with third parties other than the provider of information, this alone does not compel a narrow reading of section 552 that limits its applicability solely to such situations or precludes its applicability to providers of information who make misrepresentations to parties to transactions in which the providers of information are involved.

For the foregoing reasons, we hold that section 552 is not limited solely to: (1) suppliers of information who are in the business of

supplying information; and (2) situations involving damage stemming from a recipient of information's transactions with third parties other than the provider of information.

### 2. The Jury Instructions

The state raises three points of error regarding the trial court's instructions to the jury. The state asserts that the trial court erroneously: (1) instructed the jury regarding the definition of "unfair" and "deceptive" acts or practices associated with its claim based on HRS chapter 480; (2) declined to give its instruction regarding the absence of a privity requirement associated with a HRS chapter 480 claim; and (3) gave an unqualified instruction indicating that "sellers may promote the quality of their goods." We discuss each in turn.

#### a. *Standard of Review.*

■ It is well settled that:

When jury instructions, or the omission thereof, are at issue on appeal, "the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading." *Myers v. South Seas Corp.,* 76 Hawai'i 161, 164, 871 P.2d 1231, 1234, *reconsideration granted in part, denied in part,* 76 Hawai'i 353, 877 P.2d 890 (1994) (quoting *State v. Kelekolio,* 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993)). *See also Montalvo v. Lapez,* 77 Hawai'i 282, 286, 884 P.2d 345, 349, ("Jury instructions ... must be considered as a whole. Moreover, a refusal to give an instruction that correctly states the law is not error if another expressing a substantially similar principle is given.") (quoting *State v. Pioneer Mill Co., Ltd.,* 64 Haw. 168, 180, 637 P.2d 1131, 1140 (1981)), *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994).

*Craft v. Peebles,* 78 Hawai'i 287, 302, 893 P.2d 138, 153 (1995).

#### b. *The Trial Court Erroneously Instructed the Jury Regarding the Definition of Unfair or Deceptive Acts or Practices In the Conduct of Trade or Commerce.*

The trial court read three instructions to the jury regarding the state's claim of unfair or deceptive acts or practices in the conduct of trade. The court's instruction no. 36 provided:

The plaintiff State of Hawaii has the burden of proving by a preponderance of the evidence the following elements of its claim for unfair or deceptive acts or practices in the conduct of trade:

(1) Unfair or deceptive acts or practices on the part of defendant U.S. Steel in the conduct of trade; and

(2) Such acts or practices were the legal cause of harm or loss to plaintiff's property.

The court's special instruction no. 18, read immediately after instruction no. 36, provided that "[a] practice or act is unfair or deceptive when the practice or act is immoral, unethical, oppressive, or unscrupulous. Proof of negligent misrepresentation alone does not establish a claim for unfair or deceptive trade practices or acts." The court's instruction no. 37, read immediately thereafter, provided that "[a] deceptive trade practice is a practice which has the capacity or tendency to mislead consumers."

■ The state first argues that the court's special instruction no. 18 erroneously stated the law in that it defined both "unfair" and "deceptive" acts as being "immoral, unethical, oppressive, or unscrupulous." The state contends that while an unfair act is properly defined as one that is "immoral, unethical, oppressive, or unscrupulous," a deceptive act need not fit that definition, but need merely have the capacity or tendency to mislead or deceive. By collectively defining the two terms in the same definition, the state asserts, the trial court erroneously stated the law of unfair or deceptive acts or practices in conduct of trade or commerce and misled the jury by effectively requiring the jury to find that USX's conduct was immoral, unethical, oppressive, or unscrupulous, when all it actually needed to find was that USX's conduct had the capacity or tendency to mislead. We agree.

In *Eastern Star, Inc. v. Union Building Materials Corp.,* 6 Haw.App. 125, 712 P.2d

1148 (1985), the Intermediate Court of Appeals (ICA) noted that:

> The phrase "unfair or deceptive acts or practices in the conduct of any trade or commerce" is not defined in HRS chapter 480. However, HRS § 480–3 (Supp.1984) provides that the chapter "shall be construed in accordance with judicial interpretations of similar federal antitrust statutes[,]"[4] and HRS § 480–2 is "a virtual counterpart of § 5(a)(1) of the Federal Trade Commission Act." *Island Tobacco Co. v. R.J. Reynolds Tobacco Co.*, 63 Haw. 289, 300, 627 P.2d 260, 268 (1981) (footnote omitted). Our supreme court has stated, "HRS § 480–2, as its federal counterpart in the FTC Act, was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive business practices for the protection of both consumers and honest business[persons]." *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607, 616, 607 P.2d 1304, 1311 (1980) (footnote omitted).
>
> In *Rosa v. Johnston*, 3 Haw.App. 420, 651 P.2d 1228 (1982), we adopted the definition set forth in *Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir.1976), that "[a] practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Rosa*, 3 Haw.App. at 427, 651 P.2d at 1234. The federal cases have defined deception as an act causing, as a natural and probable result, a person to do that which he [or she] would not otherwise do. *Bockenstette v. FTC*, 134 F.2d 369 (10th Cir.1943). However, the cases indicate that actual deception need not be shown; the capacity to deceive is sufficient. *Goodman v. FTC*, 244 F.2d 584 (9th Cir.1957).

6 Haw.App. at 132–33, 712 P.2d at 1154 (footnote omitted). As is evident from the federal definitions properly adopted by the ICA in *Rosa* and *Eastern Star*, "deceptive" acts or practices are distinct from "unfair" acts or practices, both in how they are defined and in the standard by which they are proved. As the state correctly notes, read in conjunction with instruction no. 37, special

instruction no. 18 incorrectly suggested to the jury that, in order for an act to be a deceptive act or practice, it must not only have the capacity to mislead, but must also be "immoral, unethical, oppressive, or unscrupulous." In other words, by defining "unfair" and "deceptive" acts conjunctively, the trial court effectively—and improperly— imposed upon the state the burden of proving that USX's actions were "immoral, unethical, oppressive, or unscrupulous," when all it needed to prove was that USX's actions had the capacity to mislead.

██ In view of our conclusion that the trial court erroneously instructed the jury regarding the law of unfair or deceptive acts or practices in the conduct of trade or commerce, we must vacate the judgment in favor of USX on the HRS chapter 480 claim and remand for a new trial. As we have stated on numerous occasions, "erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *Quedding v. Arisumi Brothers, Inc.*, 66 Haw. 335, 340, 661 P.2d 706, 710 (1983) (brackets omitted) (quoting *Turner v. Willis*, 59 Haw. 319, 326, 582 P.2d 710, 715 (1978)); *see also State v. Holbron*, 80 Hawai'i 27, 32, 904 P.2d 912, 917 (1995) (quoting same).

██ Because the instructions erroneously stated the standard by which the jury was to find liability under HRS chapter 480, and because the jury found USX not liable, it is impossible to determine, on appellate review, whether, on the one hand, the jury properly took into consideration the distinction between "unfair" and "deceptive" acts and nevertheless found no liability under either definition and standard, or whether, on the other, the jury was misled by the erroneous instructions and made its findings regarding the HRS chapter 480 claim in reliance on that misconception. Accordingly, it is also impossible to reach an affirmative conclusion on appellate review in the present case that the error in the manner in which the jury was instructed was not prejudicial.

---

4. HRS § 480–3 (1993) is identical to the 1984 version cited to in *Eastern Star*.

c. *The Trial Court Did Nor Err in Refusing the State's Proposed Instruction Regarding The Lack of A Privity of Contract Requirement Associated With an HRS Chapter 480 Claim.*

The state next argues that the trial court erred in refusing to give its instruction regarding the lack of a privity requirement in a claim for unfair or deceptive acts or practices in the conduct of trade or commerce in violation of HRS chapter 480. The state's proposed instruction provided that "[n]o contract between U.S. Steel and the State of Hawaii is necessary to make U.S. Steel liable for unfair and deceptive trade practices." The state contends that the trial court's refusal to give the instruction was prejudicial because USX emphasized in its opening statements that there was no contractual relationship or privity between USX and the state. We disagree.

▇▇▇ We have previously noted that "[i]t is prejudicial error for the court to refuse to give an instruction relevant under the evidence which correctly states the law unless the point is adequately and fully covered by other instructions given by the court." *Agee v. Kahului Trucking & Storage, Inc.*, 67 Haw. 365, 369, 688 P.2d 256, 259 (1984) (citation omitted). Although the state is ostensibly correct that the instruction correctly stated the law, we hold, for two reasons, that the principle communicated in the state's proposed instruction is adequately and fully covered by other instructions given by the court.

▇▇▇ First, the court's instruction no. 36 was a complete and correct statement of the elements of a claim for unfair or deceptive acts or practices in the conduct of any trade or commerce. Instruction no. 36 specifically delineated what the jury needed to find in order to render USX liable and did not list the presence of a contract, or privity of contract, between USX and the state as an element. The court was not obliged to do more. To hold that the court's refusal to give the state's proposed instruction in the present case was error effectively would require trial courts to give an instruction regarding what is *not* required regarding the elements of a claim.[5]

Second, the state's claim of prejudice stemming from the court's failure to give its proposed instruction, based on USX's emphasis, during its opening statements, on the fact that USX did not have a contract with the state, nor was USX ever in privity of contract with the state, is addressed by other instructions given by the court. The court's instruction no. 4 provided that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. You should disregard any such utterance that has no basis in the evidence." Moreover, the claimed "emphasis" in USX's opening statements of lack of privity was mild at best. The state points to the following passages in USX's opening statements:

> U.S. Steel had little to do with this stadium.... Never once at any time ever did any representative of U.S. Steel come to this island and deal with anybody from either the State or the City. Never once—and the record will show this completely—was there any correspondence between anybody for the State or the City ... and U.S. Steel.
>
> ....
>
> And we had nothing at all to do, U.S. Steel did not, with respect to the construction.... And never once during that process were we asked ever to come here and do anything. Nor would it have been appropriate, since *we had no contract* with either the State or the consulting engineers or with the contractor.

(State's emphasis.) Contrary to the state's position, at least based on the above-quoted passages from USX's opening statements, it

---

5. We emphasize, however, that the converse proposition is not true. We do not mean to imply that it is necessarily reversible error for a trial court to *give* an instruction on what is not required regarding the elements of a claim. *See, e.g., State v. Mata*, 71 Haw. 319, 329, 789 P.2d 1122, 1127 (1990) (approving of instruction in case involving charges of driving under the influence of intoxicating liquor which provided in pertinent part that "[t]he State need not prove that the defendant actually drove in an unsafe or erratic manner or that the defendant caused an accident. It must prove only a diminished capacity to operate safely.").

appears that USX's theory of defense was the lack of any contact between itself and the state, and not specifically the lack of a contract or privity of contract; the reference to the lack of a contract is subsumed within the overarching theory of the lack of any connection whatsoever. USX was entitled to articulate its theory of the case and emphasize the lack of any connection at all between itself and the state.

Moreover, in view of the fact that, at the time USX made its opening statements, the state had not yet withdrawn its claim of breach of warranties, to which the issue of privity was relevant, USX was entitled to assert in its opening statement that the state did not have a contract with USX and that the state was not in privity with USX. Additionally, we note that USX's comments during its opening statements did not constitute affirmative misstatements of the law that would carry the potential of misleading the jury; our holding regarding a trial court's refusal of an instruction in order to clarify or counteract the effect of such misleading comments would likely be different under such circumstances.

We therefore hold that the trial court did not err in refusing to give the state's proposed instruction regarding the lack of a privity of contract requirement associated with an HRS chapter 480 claim.

d. *The Trial Court Did Not Err In Instructing the Jury That Sellers May Promote the Quality of Their Goods.*

The state next asserts that the trial court erred in giving instruction no. 44, which provided that "[s]ellers may promote the quality of their goods." The state contends that "the unqualified and unadorned blanket statement that 'sellers may promote the quality of their goods' implies that there are no limits whatsoever to a seller's ability to promote the quality of its goods, including, for example, outright misrepresentation and deception, which are plainly *not* allowed." Instead, the state argues, the instruction should have contained some reference to "puffing" or general sales talk commending a seller's goods to convey to the jury that a

seller's right to promote its goods is not unlimited.

USX retorts by stating that the instruction is a correct statement of the law and that, viewed in the full context of the other instructions read to the jury regarding unfair or deceptive acts or practices in the conduct of any trade or commerce, qualifications regarding "puffing" or sales talk would have been redundant and unnecessary. We agree.

▇▇▇ The court read the following instruction to the jury:

The plaintiff, State of Hawaii, has the burden of proving by a preponderance of the evidence the following elements of its claim for unfair or deceptive acts or practices in the conduct of trade.

1. Unfair or deceptive acts or practices on the part of defendant U.S. Steel in the conduct of trade; and

2. Such acts or practices were the legal cause of harm or loss to the plaintiff's property.

A practice or act is unfair or deceptive when the practice or act is immoral, unethical, oppressive, or unscrupulous. Proof of negligent misrepresentation alone does not establish a claim for unfair or deceptive trade practice or acts.

A deceptive trade practice is a practice which has the capacity or tendency to mislead consumers. Sellers may promote the quality of their goods.

Read in isolation, the state's claim that the unqualified statement that "sellers may promote the quality of their goods" is prejudicial may have minimal merit; however, read in context, as the court must, *see Craft,* 78 Hawai'i at 302, 893 P.2d at 153, the instructions regarding a seller's ability to promote the quality of its goods was qualified by the court's other instructions regarding the state's HRS chapter 480 claim.

Therefore, in view of: (1) our assessment that the amount of potential prejudice, stemming from the challenged instruction, is minimal, even if considered in isolation; and (2) the fact that the challenged instruction was not read in isolation, and any prejudicial effect that the statement that "sellers may promote the quality of their goods" may have

had was dissipated when placed in context,[6] we hold that, when read and considered as a whole, the instruction that "sellers may promote the quality of their goods" was not prejudicially insufficient, erroneous, inconsistent or misleading.

### 3. The Trial Court's Denial of the State's Motion for New Trial and For Sanctions Based on Alleged Discovery Abuse by USX

Finally, the state argues that the trial court erroneously denied its motion for new trial based on alleged discovery abuse by USX. The state asserts that USX continually failed to comply with its discovery obligations by claiming to have turned over all documents requested when the evidence showed that USX had not made a good faith diligent effort to find the requested documents and that documents that were produced later proved that USX had withheld certain documents. USX retorts by asserting that the trial court properly denied the state's motion for new trial because: (1) the state's objections to any impropriety, if any, were untimely; (2) the state has not demonstrated any prejudice; and (3) USX did not violate its discovery obligations. We affirm the trial court's denial of the state's motion for new trial based on the untimeliness of the state's objections.

#### a. *Standard of Review.*

Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion. *Richardson [v. Sport Shinko (Waikiki*

*Corp.)* ], 76 Hawai'i [494,] 503, 880 P.2d [169,] 178 [ (1994) ]; *see also Stahl v. Balsara,* 60 Haw. 144, 152, 587 P.2d 1210, 1215 (1978). An abuse of discretion occurs "where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 114, 839 P.2d 10, 26, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992).

*Carr v. Strode,* 79 Hawai'i 475, 488, 904 P.2d 489, 502 (1995).

#### b. *The State's Objections to USX's Failures to Produce Documents During Discovery Were Untimely and, Therefore, Are Not A Valid Basis For the Grant of A New Trial.*

Both before and during the trial, the state asserted that USX was not fulfilling its duties to produce documents. In particular, on May 3, 1993, the state filed a motion for sanctions against USX for failure to comply with document production requirements, asserting that USX had wilfully failed to produce documents pursuant to the state's requests for discovery. On May 6, 1993, the trial court orally granted in part and denied in part the state's motion, ordering that USX produce all documents relevant to all issues in the case and barring USX from referring to and/or introducing into evidence at trial any document that it had failed to produce in response to the state's discovery requests, as well as prohibiting USX from relying on or commenting on any alleged lack of proper foundation or context or any such partial or

---

**6.** We are aware that the "context" upon which we base our conclusion that the instruction is proper includes the erroneous instruction that "a practice or act is unfair or deceptive when the practice or act is immoral, unethical, oppressive, or unscrupulous[,]" *see* section III.A.2.b., *supra*. Our holding, however, is premised both on our assessment of the potential prejudice stemming from the "sellers may promote the quality of their goods" instruction as being minimal as well as the alleviating effects of the context in which the purportedly harmful instruction was read.

Moreover, the state's argument draws a large amount of its persuasiveness from its contention, as previously discussed, that the challenged instruction "implies that there are no limits whatsoever to a seller's ability to promote the quality of its goods, including, for example, outright misrepresentation and deception, which are plainly *not* allowed." In our estimation, this implication is defused by the context in which the instruction was read, despite the presence of an otherwise erroneous instruction regarding the elements of an HRS chapter 480 claim, simply by virtue of the presence of a contrary point of view.

We emphasize that our holding regarding the "sellers may promote the quality of their goods" instruction does not in any way diminish our holding regarding the "practice or act is unfair or deceptive when the practice or act is immoral, unethical, oppressive, or unscrupulous" instruction.

incomplete document, should it be introduced at trial.

Subsequently, on August 13, 1993, during USX's case in chief, one of USX's witnesses, Robert Schmitt, attempted to use four technical reports that fell within the scope of the state's discovery requests, but had not been produced by USX. The state objected to Schmitt's reference to or use of these reports, and the court sustained the state's objection, ruling that USX "failed to produce in identical form a document or documents which were subject of discovery before trial" and that USX "knew or had reason to know that the differences in the documents were material."

Thereafter, Ronald Flucker, a former USX employee, contacted counsel for the state, and, on September 1, 1993, provided the state with twenty-two items of internal USX correspondence dated in 1975 that had either not been produced by USX or apparently had been produced by USX in a different, less "questionable" form. The state argues that these developments, revealed during trial, clearly demonstrate that USX was derelict in its discovery obligations and that, even if the documents learned of during trial did not aid the state's case to the point where this court could conclude that the trial's result would have been different had the state been able to incorporate the evidence in its case, USX's proven discovery violations strongly suggest that USX had withheld other evidence, of which the state is still unaware, favorable to the state's case.

The state, however, did not attempt to call Flucker as a witness in its rebuttal case, nor did it attempt to bring to the court's attention in any fashion the documents provided by Flucker. Instead, it waited until after the jury returned an adverse verdict and then moved for a new trial based on USX's misconduct. The trial court denied the motion, holding that the state

> failed to show that any discovery abuse was of such a nature or magnitude as to justify a new trial. The proof submitted indicates that the result would not have been different. The jury's verdict is supported by substantial evidence.... Moreover, the State's objections are untimely.

The State's failure to move for a mistrial during the proceeding suggests that the State waived any questions relating to an alleged discovery abuse.

USX argues that, even if it could be found to have violated its discovery obligations, the state's objections to the "new" evidence—the documents sought to be used by Schmitt and the documents provided the state by Flucker—were untimely. We agree.

 The state does not dispute that it did not object or otherwise attempt to seek relief prior to the jury's deliberations, whether in the form of a motion for a mistrial, for more discovery, or for an investigation into the extent of USX's alleged nondisclosure. Instead, it argues that USX's proven failure to disclose requested documents was a "gross injustice" that deprived the state of its ability to adequately prepare and present its case. The state contends that it was effectively unable to have USX's misconduct "cured" prior to the jury's deliberations because: (1) it had already presented its case; (2) a mistrial would have required the state to start anew, incurring extensive litigation expenses, risking the loss of key witnesses, and giving USX a second chance to prepare a better defense; and (3) even if additional discovery had been allowed, any new evidence would have had to have been presented out of order.

 Each of the state's reasons, however, ultimately amounts to strategic decisions that should not provide it any relief from its obligation to preserve its objections to USX's misconduct, so as to provide a viable basis for seeking the grant of a new trial. As the ICA has noted in an analogous situation:

> Generally, an improper appeal by an opposing party to the prejudices and sympathies of the jury is a ground for granting a motion for a new trial where 1) the moving party has been injured by the improper appeal; 2) *the moving party took proper steps to preserve his [or her] right to relief;* 3) the moving party sought to have the harmful effect of the improper appeal remedied by an appropriate jury instruction; and 4) the effect of the improper appeal was not adequately dissipat-

ed by the steps taken, 58 Am.Jur.2d *New Trial* § 59 (1971); *cf. Nelson v. Hartman,* 199 Mont. 295, 648 P.2d 1176 (1982); *Philpott v. Jordan,* 572 P.2d 1030, 280 Or. 803 (1977); *Bachran v. Morishige,* 52 Haw. 61, 469 P.2d 808 (1970); or 5) *the error was so fundamental that gross injustice would result if a new trial is not granted.* 11 Wright & Miller, Federal Practice and Procedure: *Civil* § 2805 (1973).

These requirements prevent a party "*from gambling on the outcome of the jury's deliberations while secretly preserving the error to be raised on a motion for a new trial in the event of an unfavorable verdict.*" *Weathers v. Kaiser Foundation Hospitals,* 5 Cal.3d 98, 103, 95 Cal.Rptr. 516, 519, 485 P.2d 1132, 1135 (1971).

With respect to the allegedly improper remarks by [defendant's] counsel during opening statement, *[plaintiff] did not object to them prior to the verdict.* With respect to [defendant's] allegedly improper testimony, [plaintiff's] only objection prior to the verdict was made on the ground or relevancy. *Moreover, [plaintiff] did not promptly seek to have the alleged harmful effect of the allegedly improper remarks and testimony overcome by means of an instruction to the jury or a motion for a mistrial.*

*Leyson v. Steuermann,* 5 Haw.App. 504, 510–11, 705 P.2d 37, 43 (1985) (emphases added), *overruled on other grounds, Bernard v. Char,* 79 Hawai'i 362, 903 P.2d 667 (1995).

We therefore hold that the trial court did not abuse its discretion by denying the state's motion for new trial and for sanctions based on USX's discovery violations.

7. HRS § 607–14 (1993) provides in pertinent part:

**Attorneys' fees in actions in the nature of assumpsit, etc.** In all the courts, in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee, there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; provided that the attorney representing the prevailing party shall submit to the court an affidavit stating the amount of time the attorney spent on the ac-

### B. USX's Cross–Appeal

USX argues on its cross-appeal that the trial court erred in denying its motion for attorneys' fees on the basis that HRS § 607–14 [7] does not apply to the state. However, because we vacate the judgment in favor of USX and remand for further proceedings, we need not reach USX's arguments regarding the propriety of the trial court's denial of USX's motion for attorneys' fees.

The obligation to pay attorneys' fees under HRS § 607–14 applies only to "losing parties," and, in view of our remand of this case, the state cannot be considered the "losing party." *See Sapp v. Wong,* 62 Haw. 34, 42, 609 P.2d 137, 142 (1980) ("[I]n view of what we have said, we must reverse this case on appeal, vacate the judgment and remand for a new trial. Hence, appellants cannot at this time be considered to be the losing parties, even if we assume that appellant's amended complaint is an action in the nature of assumpsit.").

### III. CONCLUSION

For the foregoing reasons, the circuit court's order granting USX's motion to dismiss the state's negligent misrepresentation claim and the judgment in favor of USX on the state's claim for unfair or deceptive acts or practices in the conduct of any trade or commerce are vacated, and the case is remanded for further proceedings. The judgment of the circuit court is otherwise affirmed.

tion and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an hourly rate, the amount of the agreed upon fee. The court shall then tax attorneys' fees, which the court determines to be reasonable, to be paid by the losing party; provided that this amount shall not exceed twenty-five percent of the judgment.

. . . .

The above fees provided for by this section shall be assessed on the amount of the judgment exclusive of costs and all attorneys' fees obtained by the plaintiff, and upon the amount sued for if the defendant obtains judgment.