978 P.2d 753

STATE FARM FIRE AND CASUALTY COMPANY, a foreign corporation, State Farm Mutual Automobile Insurance Company, a foreign corporation, HBIF, Limited, a Hawai'i corporation, Gregory Hebert and Rudy Marn, Plaintiffs–Appellants,

v.

PACIFIC RENT–ALL, INC., a Hawai'i corporation, Grimmer–schmidt, a foreign corporation, John Does 1–20, Jane Does 1–20, Doe Partnerships 1–20, Doe Corporations 1–20, Doe Entities 1–20 and Doe Governmental Units 1–20, Defendants–Appellees.

No. 19854.

Supreme Court of Hawai'i.

May 28, 1999.

Reconsideration Denied June 16, 1999.

318

John M. Kirimitsu (Stanford H. Nakamoto with him on the brief) of Kiuchi & Nakamoto, Honolulu, for plaintiffs-appellants.

James Shin (Roy F. Hughes with him on the brief) Honolulu, for defendant-appellee Pacific Rent–All, Inc.

James Kawashima (Ryan M. Akamine with him on the brief) Honolulu, for defendant-appellee Grimmer–Schmidt.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by RAMIL, J.

In this negligence and strict products liability action, plaintiffs-appellants State Farm Fire and Casualty Company (State Farm Fire), State Farm Mutual Automobile Insurance Company (State Farm Auto), HBIF, Limited (HBIF), Gregory Hebert, and Rudy Marn (collectively "Plaintiffs" or "Appellants") appeal from the circuit court's orders and first amended final judgment, granting in part and denying in part (1) defendant-appellee Pacific Rent–All, Inc. (Pacific)'s motion to dismiss and for attorneys' fees and costs and (2) defendant-appellee Grimmer–Schmidt's motion to dismiss.

Based upon the following, we affirm in part and vacate in part the circuit court's first amended final judgment, filed on April 30, 1996. We remand the remaining claims to the circuit court for proceedings consistent with this opinion.

## I. BACKGROUND

### A. The Accident and the Two Complaints

On January 18, 1992, Marn rented a Grimmer–Schmidt air compressor from Pacific and transported the compressor to the corporate headquarters of HBIF, located at Alaheiau Road in Kea'au, Hawai'i (the "HBIF building"). The HBIF building contained the corporate offices of HBIF, with Marn serving as its vice-president and manager. The HBIF building also contained residential apartments, in which Marn and Hebert lived.

Marn placed the compressor on the lanai of his HBIF apartment. When Marn used the compressor on January 19, 1992, the fuel hose apparently pulled away from the fuel tank, causing the compressor to ignite and explode. The explosion threw Marn to the ground, causing personal injury to Marn and substantial fire damage to the HBIF building and its contents, as well as to HBIF, Marn, and Hebert's property. Sometime thereafter, HBIF, Hebert, and Marn submitted claims to State Farm Fire and State Farm Auto, which State Farm Fire and State Farm Auto subsequently paid.[1]

On December 21, 1992, Marn filed a complaint against Pacific and Grimmer–Schmidt for personal injuries and property damage. Marn's complaint contained one count alleging negligence in the design, manufacture, renting, servicing, maintaining, and/or selling of compressors, and one count alleging strict products liability. Almost one year later, on December 7, 1993, Marn executed a "Settlement Agreement and Joint Tortfeasor Release" (hereinafter referred to as the "Agreement")[2] with Grimmer–Schmidt, which called for the settlement, in the amount of $20,-

---

1. The exact date of payment is not contained within the record on appeal. Because Marn averred in his affidavit of May 3, 1994 that he "was aware that under the terms of his insurance contract, Plaintiff State Farm Fire and Casualty had obtained a subrogation interest in [his] claims for property damages arising out of the instant fire[,]" we assume, *only* for the purposes of this appeal, that State Farm Fire paid Marn's insurance claim prior to Marn executing the Settlement Agreement and Joint Tortfeasor Release.

2. The Agreement provided, in pertinent part:
*DEFINITIONS*
 1. "MARN" means and includes Rudy G. MARN as well as his heirs, executors, administrators, agents, successors and assigns.
 . . . .
 5. *"Injuries" means* and includes all past, present or future *injuries or damages,* known or unknown, *sustained by MARN and includes* but is not limited to bodily injury, disability, disfigurement, loss of consortium, emotional distress, psychiatric/psychologic inkuries [sic] and disabilities, *property damage,* punitive damages, general and special damages including known or unknown, anticipated or unanticipated, directly resulting or indirectly resuling [sic] from, arising out of, or connected with, by any means direct or indirect, the Accident.
 6. "Litigation" means and includes all claims asserted or unasserted, known or unknown, in Civil No. 92–592 (Hilo), *Rudy G. MARN v. Pacific Rent–All, Inc., a Hawaii corporation, Grimmer–Schmidt Corp., an Indiana corporation, John Does 1–10, Jane Does 1010,*

*Doe Government entities 1–10, Doe Corporations 1–10, and Does Legal Entities 1–10.*
 . . . .
 8. *"Property Damage" means* and includes all past, present or future *damages, known or unknown, to real property,* and tangible things *owned by or in the care, custody and control of MARN, including real property of others,* resulting from, arising out of or connected with, by any means, direct or indirect, the Accident.
*RECITALS*
 1. On a date before January 19, 1992, *MARN and/or an agent acting on MARN's behalf rented a compressor from Pacific to be used by MARN in conjunction with painting at his home.*
 . . . .
*AGREEMENT*
 1. *Settlement of All Claims.* Under this Settlement Agreement, . . . *all claims of MARN* for Injuries and Property Damage arising out of Accident are fully and finally settled, resolved and released.
 This Settlement Agreement serves as a "global" Agreement as respects all all [sic] claims, potential as well as asserted, by MARN for Injuries and Property Damage arising out of the Accident and is intended and agreed to by the parties, through counsel, *as a general release of all persons[,] parties and claims in the world by MARN for Injuries and Property Damage arising out of the Accident.*
 The parties acknowledge and agree further: in the event this Settlement Agreement is placed before the Court and for any reason the Settlement Agreement is not construed as the

000.00, and which released all of Marn's claims, against Pacific and Grimmer-Schmidt, arising out of personal injury and property damage occurring on January 19, 1992. Marn thereafter voluntarily dismissed his complaint on December 16, 1993.

On January 14, 1994, Plaintiffs State Farm Fire, State Farm Auto, HBIF, Hebert, and Marn filed a complaint, consisting of four counts, against Pacific and Grimmer-Schmidt for property damage and subrogation arising from the January 19, 1992 explosion and fire. Count One of Plaintiffs' complaint alleged strict products liability for improper and/or defective design, manufacture, assembly, and inspection of the Grimmer-Schmidt compressor. State Farm Fire and State Farm Auto asserted a right of subrogation as to the amounts paid to HBIF, Hebert, and Marn. Count Two set out a separate subrogation claim under Hebert's State Farm automobile insurance policy for $17,522.80, representing the cost of Hebert's 1991 Lincoln Continental, which was destroyed by the fire. Count Three alleged a breach of express and im-

plied warranties. Count Four alleged negligence in the design, manufacture, assembly and/or inspection of the compressor.

Unlike Marn's complaint and Agreement, Plaintiffs' complaint averred that HBIF rented the compressor in order to perform certain renovations to HBIF's real property. Plaintiffs averred that HBIF had a State Farm fire and casualty insurance policy in full force and effect, that Hebert had a State Farm automobile insurance policy in full force and effect, and that Hebert and Marn had a State Farm renter's insurance policy in full force and effect.[3] Plaintiffs averred that, as a result of the fire, HBIF, Hebert, and Marn submitted insurance claims to State Farm Fire and State Farm Auto. Plaintiffs sought recovery of "an amount to cover the damages sustained in excess of the jurisdictional limits of the Circuit Courts of the State of Hawaii, which will be proven at trial."

### B. *The Dismissal*

On April 14, 1994, Pacific moved to dismiss the January 14, 1994 complaint based upon

---

general release intended, the parties agree *the Agreement shall be construed as a Joint Tortfeasor Release within the purview of H.R.S. Section 663–12 et seq. to fully, finally and forever release all liability of Pacific and Grimmer for Injuries and Property Damage arising out of the Accident.* More specifically:

a. *MARN agrees to a full and final general release of all litigation claims against Pacific and Grimmer as well as all claims, known or unknown, for Injuries and Property Damage arising out of the Accident (inclusive of all past, present or future claims for injury and property damage which MARN now has or may have, whether known or whether anticipated or not, resulting from, arising out of or to arise out of, or connected with, directly or indirectly, the Accident);*

. . . .

5. *Indemnity and Defense. MARN, for the consideration received, fully and completely agrees to indemnify, hold harmless and defend Pacific and Grimmer from any loss, liability, claim or expense stemming from any claim, lien, demand or action (past, present or future) which may be brought by MARN on account of the Accident, Injuries, Litigation or Property Damage claim.*

. . . .

7. *Complete Bar. Acceptance of the consideration from Pacific and Grimmer constitutes a full, complete and final bar to any claim, action, cause of action, claim for relief, liability, liabilities, cost, expense, fee demand, injury or loss of whatever name or nature against Pacific*

*and Grimmer which in any manner arises out of, arose out of or is connected with, directly or indirectly, the Accident, Injuries, Property Damage claim or Litigation.*

8. *Knowing Release. MARN acknowledges and confirms that no representation of fact, opinion or promise has been made to induce the Settlement Agreement, apart from this writing and Settlement agreement, and, MARN expressly acknowledges he has not relied upon any statement, representation, opinion or promise by anyone or any entity in executing this Settlement Agreement other than as is set forth in this Settlement.*

. . . .

11. *Integration.* This Settlement Agreement contains the entire agreement between the parties with regard to matters set forth herein and shall be binding upon and inure to the benefit of the parties hereto, jointly and severely [sic], and to the agents, executors, administrators, personal representatives, offices, directors, employees, successors and assign of each.

. . . .

14. *Nondisclosure. MARN agrees and acknowledges that he will not divulge any terms of this Settlement Agreement with any entity, including but not limited to his heirs, executors, administrators, agents, subrogees, successors and assigns. . . .*
(Emphases added.)

3. The policies are not included in the record on appeal.

the defenses of release and accord and satisfaction. In support, Pacific argued that Marn had already dismissed with prejudice all claims against defendants arising out of the January 19, 1992 fire, as evidenced by the application and indemnification provisions of the Agreement. Pacific asserted that, because Hebert and Marn were corporate officers of HBIF and, as such, were authorized to act on its behalf in all matters concerning the corporation, HBIF, Hebert, and Marn relinquished all rights arising from the fire and that, accordingly, the complaint must be dismissed. Pacific also argued that it was entitled to an award of attorneys' fees and costs for bringing the motion, because plaintiffs failed to respond to its informal requests to dismiss the case. Pacific attached an affidavit of counsel and three exhibits, including (1) Marn's December 21, 1992 complaint, (2) the December 7, 1993 Settlement Agreement, and (3) the December 16, 1993 stipulation to dismiss Marn's complaint with prejudice. On April 27, 1994, Defendant Grimmer–Schmidt similarly filed a motion to dismiss the complaint. For the same reasons as argued by Pacific, Grimmer–Schmidt argued that Plaintiffs' complaint was barred.

On May 3, 1994, Plaintiffs filed a memorandum in opposition to the motions to dismiss, arguing that State Farm Fire and State Farm Auto acquired rights of subrogation against defendants by virtue of benefits paid to HBIF, Hebert, and Marn as a result of the fire. Plaintiffs also argued that HBIF and Hebert were not parties to the Marn lawsuit, the negotiations, or the Agreement, and that Marn lacked the authority to bind HBIF or Hebert through the Agreement or dismissal of his complaint. With respect to the viability of Marn's claims, Marn argued that he did not intend to settle his property claims with defendants, implying that he was unaware of the contents of the Agreement.

Plaintiffs attached an affidavit of counsel, an affidavit of Marn, a copy of Marn's complaint, and a copy of the Agreement to their memorandum in opposition. In Marn's affidavit, he averred that, although he was the vice-president and manager of HBIF, he filed the December 21, 1992 lawsuit in his individual capacity and "at no time was [he] authorized to act on behalf of" HBIF or Hebert. Marn further stated that at no time did he represent to the defendants that he was acting on behalf of HBIF or Hebert. Marn also averred that he "was aware that under the terms of his insurance contract, Plaintiff [State Farm Fire] had obtained a subrogation interest in [his] claims for property damages" and that he did not intend to settle his property damage claims in the Agreement.

On June 7, 1994, the circuit court partially granted Pacific's motion to dismiss the complaint with prejudice, with respect to: (1) Marn, HBIF, and Hebert's claims against Defendants Pacific and Grimmer–Schmidt; (2) all claims brought through or on behalf of Marn (i.e., State Farm Fire's claimed subrogation rights); and (3) Pacific's request for attorneys' fees and costs.[4] The circuit court, however, denied the motion with respect to Count Two, preserving Hebert and State Farm Auto's claims regarding the destroyed Lincoln automobile. On October 21, 1994, the circuit court similarly granted in part and denied in part Grimmer–Schmidt's motion to dismiss, denying its oral request for costs.

On May 9, 1995, Plaintiffs moved for reconsideration or, in the alternative, for an HRCP Rule 54(b) certification to appeal the circuit court's decisions. The circuit court denied Plaintiffs' motion for reconsideration on the basis that "no new issues were raised to warrant granting reconsideration of the Court's respective orders" and, in the alternative, denied the motion for certification

4. It appears that the circuit court awarded attorneys' fees and costs to defendant-appellee Pacific under the inherent powers doctrine. See Kawamata Farms, Inc. v. United Agri Products, 86 Hawai'i 214, 257–58, 948 P.2d 1055, 1098–99 (1997); Enos v. Pacific Transfer & Warehouse, Inc., 79 Hawai'i 452, 459, 903 P.2d 1273, 1280, reconsideration denied, 80 Hawai'i 187, 907 P.2d 773 (1995). Appellants however did not argue, in the instant appeal, for a reversal of the circuit court's award of attorneys' fees and costs. In fact, because the award took the form of attorney sanctions, it would have been improper to raise the issue here, unless the attorney were named as a party in the notice of appeal. See Gold v. Harrison, 88 Hawai'i 94, 104–05, 962 P.2d 353, 363–64 (1998).

because it "would result in piecemeal litigation." On December 14, 1995, the circuit court entered a final judgment. The parties voluntarily dismissed Count Two on February 5, 1996. An amended final judgment was entered on April 30, 1996, and Plaintiffs timely appealed.

## II. *STANDARD OF REVIEW*

Although Defendants' motions, prompting the circuit court's orders partially dismissing Plaintiffs' January 14, 1994 complaint, were styled as motions to dismiss under Hawai'i Rules of Civil Procedure (HRCP) Rule 12(b)(6), the applicable rule of civil procedure was HRCP Rule 56, relating to summary judgment. *See State ex rel. Bronster v. United States Steel Corp.*, 82 Hawai'i 32, 38–39, 919 P.2d 294, 300–01 (1996); *Au v. Au*, 63 Haw. 210, 212, 626 P.2d 173, 176, *aff'd on reconsideration*, 63 Haw. 263, 626 P.2d 181 (1981); *Gonsalves v. First Ins. Co.*, 55 Haw. 155, 159–60, 516 P.2d 720, 723 (1973). Indeed, HRCP Rule 12(b) provides in pertinent part that:

> If, on a motion . . . to dismiss for failure . . . to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, *the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56*, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

(Emphasis added.)

 As noted in the factual section above, the parties presented various matters outside of the pleadings to the circuit court, including numerous exhibits and affidavits of counsel and parties. We therefore review the challenged motions to dismiss pursuant to the standard relating to summary judgment.

> We review [a] circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

> [s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Id.* (citation and internal quotation marks omitted); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

*Konno v. County of Hawai'i*, 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting *Dunlea v. Dappen*, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)) (brackets in original). "The evidence must be viewed in the light most favorable to the non-moving party." *State ex rel. Bronster v. Yoshina*, 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." *Maguire*, 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

*State Farm Mut. Auto. Ins. Co. v. Murata*, 88 Hawai'i 284, 287–88, 965 P.2d 1284, 1287–88 (1998) (citation omitted) (brackets in original); *see also United States Steel Corp.*, 82 Hawai'i at 38–39, 919 P.2d at 300–01. Furthermore, as a question of law, an appellate court reviews *de novo* the circuit court's determination whether a settlement agreement is enforceable or unenforceable. *See Sylvester v. Animal Emergency Clinic of Oahu*, 72 Haw. 560, 565, 825 P.2d 1053, 1056 (1992); *Han v. Yang*, 84 Hawai'i 162, 167, 931 P.2d 604, 609 (App.1997); *see generally Gossinger v. Association of Apartment Owners of the Regency of Ala Wai*, 73 Haw. 412, 835 P.2d 627 (1992).

## III. *DISCUSSION*

Appellants contend that the circuit court erred in granting partial summary judgment in favor of Appellees Pacific and Grimmer–Schmidt by ruling as a matter of law (1) that Marn settled his property damage claim through the Agreement and, consequently, settled State Farm Fire's subrogation claim, and (2) that Marn possessed the authority to settle and did settle the property damage claims of HBIF and Hebert and, consequently, settled State Farm Fire's subrogation claims arising therefrom. Appellants essentially argue that genuine issues of material fact preclude summary judgment.

We agree with Appellees that Marn's settlement with Pacific and Grimmer–Schmidt barred his claims, as set forth in the January 14, 1994 complaint. However, we agree with Appellants that the circuit court incorrectly dismissed HBIF, Hebert, and State Farm Fire's claims.

A. *The December 7, 1993 Settlement Agreement Barred Marn's Property Damage Claim in the January 14, 1994 Complaint.*

 A properly executed settlement agreement generally precludes future litigation for its parties. *See AIG Hawaii Ins. Co. v. Bateman,* 82 Hawai'i 453, 458–59, 923 P.2d 395, 400–01, *amended in part,* 83 Hawai'i 203, 925 P.2d 373 (1996). Indeed, a settlement agreement

> "is an agreement to terminate, by means of mutual concessions, a claim which is disputed in good faith or unliquidated. It is an amicable method of settling or resolving bona fide differences or uncertainties and is designed to prevent or put an end to litigation." 15A Am.Jur.2d *Compromise and Settlement* § 1 (1976).

We acknowledge the well-settled rule that the law favors the resolution of controversies through compromise or settlement rather than by litigation. *Dowsett v. Cashman,* 2 Haw.App. 77, 82–83, 625 P.2d 1064, 1068 (1981). Such alternative to court litigation not only brings finality to the uncertainties of the parties, but is consistent with this court's policy to foster amicable, efficient, and inexpensive resolutions of disputes. In turn, it is advantageous to judicial administration and thus to government and its citizens as a whole. We agree with the policy and law of settlements which the Supreme Court of Arkansas succinctly sets forth in *Ragland v. Davis,* 301 Ark. 102, 106–107, 782 S.W.2d 560, 562 (1990) (citation omitted, emphasis added):

> *Courts should, and do, so far as they can do so legally and properly, support agreements which have for their object the amicable settlement of doubtful rights by parties;* the consideration for such agreements is not only valuable, but highly meritorious. *Because they promote peace, voluntary settlements . . . must stand and be enforced if intended by the parties to be final,* notwithstanding the settlement made might not be that which the court would have decreed if the controversy had been brought before it for decision. *Such agreements are binding* without regard to which party gets the best of the bargain or whether all the gain is in fact on one side and all the sacrifice on the other.
>
> . . . .
>
> A compromise or settlement agreement disposes of all issues the parties intended to settle. *In re Estate of Engels,* 10 Kan. App.2d 103, 692 P.2d 400 (1984). . . .
>
> . . . .
>
> Having found the settlement to be valid and enforceable, the terms of the settlement would control. . . .

*Sylvester,* 72 Haw. at 565–71, 825 P.2d at 1056–59 (emphases added); *see also Gossinger,* 73 Haw. at 423–24, 835 P.2d at 633–34; *Han,* 84 Hawai'i at 167–68, 931 P.2d at 609–10.

 The instant case appears to present a properly executed settlement agreement. Marn argues, however, that he did not intend to settle his property damage claim and that a genuine issue of fact precludes summary judgment, even though the Agreement repeatedly provides for the settlement of his property damage claim.

 It is well settled that courts should not draw inferences from a contract regarding the parties' intent when the contract is definite and unambiguous. *See Hanagami v. China Airlines, Ltd.,* 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984) (citation omitted). In fact, contractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech. *See Amfac, Inc. v. Waikiki Beachcomber Inv. Corp.,* 74 Haw. 85, 108, 839 P.2d 10, 24, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). The court should look no further than the four corners of the document to determine whether an ambiguity exists. *See KL Group v. Case, Kay & Lynch,* 829 F.2d 909, 916 (9th Cir.1987) (applying Hawai'i law). Consequently, the parties' disagreement as to the meaning of a contract or its terms does not render clear language ambiguous. *See State Farm Mut. Auto. Ins. Co. v. Fermahin,* 73 Haw. 552, 556, 836 P.2d 1074, 1077 (1992); *Hawaiian Ins. & Guar. Co. v. Chief Clerk of the First Circuit Court,* 68 Haw. 336, 342, 713 P.2d 427, 431 (1986).

 It is equally well settled that

[t]he parol evidence rule is invoked to bar the testimony of prior contemporaneous negotiations and agreements that vary or alter the terms of a written instrument. The rule is one of substantive law setting forth the well-settled principle that an agreement reduced to writing serves to integrate all prior agreements and negotiations concerning the transaction into the written instrument which then represents the final and complete agreement of the parties. The rule then bars evidence of collateral agreements that would vary or alter the written terms and is called into play where the issue involves the rights and duties created by the instrument. *As a rule of substantive law, it determines the parties' legally enforceable contractual obligations and precludes consideration of extrinsic evidence to the contrary. Akamine & Sons v. American Security Bank,* 50 Haw. 304, 440 P.2d 262 (1968); *Midkiff v. Castle & Cooke, Inc.,* 45 Haw. 409, 368 P.2d 887 (1962).

*Historically, in an action to determine the parties' contractual rights under an agreement, the court's only inquiry would center around whether the written agreement was a total integration of the parties' intent.* If so,' absent evidence of mistake or fraud, the rule barred introduction of any extrinsic evidence that varied or altered the terms. *See* 4 Williston Contracts § 633 (1961).

*Cosmopolitan Fin. Corp. v. Runnels,* 2 Haw. App. 33, 37–38, 625 P.2d 390, 395 (1981) (emphases added). Therefore, absent fraud, duress, mistake or ambiguity, extrinsic evidence is excluded once it is determined that a contract is fully integrated. *See Industrial Indem. Co. v. Aetna Cas. & Sur. Co.,* 465 F.2d 934, 937 (9th Cir.1972); *Akamine & Sons, Ltd. v. American Sec. Bank,* 50 Haw. 304, 310, 440 P.2d 262, 266 (1968).

The Agreement, in the instant case, also appears to be fully integrated. Paragraph 11 provides that "[t]his Settlement Agreement contains the entire agreement between the parties[,]" and, further, paragraph 8 provides that "no representation of fact, opinion or promise has been made to induce the Settlement Agreement, apart from this writing and Settlement Agreement, and, MARN expressly acknowledges he has not relied upon any statement, representation, opinion or promise by anyone or any entity in executing this Settlement Agreement other than as is set forth in this Settlement." Turning to the contract terms, the plain and ordinary language contained within the Agreement repeatedly provides for the settlement of Marn's property damage claim. As the Agreement is an integrated document, the parol evidence rule bars consideration of Marn's belated assertions that he did not intend to settle his property damage claim.

Without expressly stating so, Marn, however, implies that he was mistaken about the contents of the Agreement and/or that he was without knowledge of the Agreement's many references to settling his property damage claim arising from the January 19, 1992 accident. Marn states in his affidavit that he asked his attorney to preserve his property damage claim, basically because he

was aware of State Farm Fire's subrogation rights through the renter's insurance policy.

 This court, in *AIG Hawaii Ins. Co. v. Bateman*, 82 Hawai'i 453, 457–58, 923 P.2d 395, 399–400, *amended in part*, 83 Hawai'i 203, 925 P.2d 373 (1996), addressed a request for rescission and cancellation of a settlement agreement on the basis of mistake. In *Bateman*, this court stated that a contract is voidable where one party is mistaken as to a basic assumption supporting the contract at the time of its making—if the mistake is material and has an adverse effect to the agreed exchange of performances—so long as (1) the mistaken party has not borne the risk of the mistake and (2) enforcement of the contract would not be unconscionable, or the other party had reason to know of the mistake or caused the mistake. *Id.* (citing *Restatement (Second) of Contracts* § 153, at 394, and § 154, at 402–03 (1979)). Furthermore, where the party seeking relief was not mistaken but consciously ignored the fact that he or she had limited knowledge of the facts, he or she effectively bears the risk of that mistake. *Id.* at 457–58, 923 P.2d at 399–400 (citing *Restatement (Second) of Contracts* § 154 cmt. c).

Applying the above principles, we are led ineluctably to one conclusion—that the circuit court did not err in dismissing Marn's property damage claim. First, Marn has not requested the rescission or cancellation of the Agreement. Second, he has barely implied that he was mistaken about its contents. Third, a simple reading of the Agreement reveals the more than ten times that Marn's property damage claim was incorporated therein. Moreover, the Agreement also repeatedly incorporates, within the scope of settlement, future claims, known and unknown. Thus, Marn has effectively borne the risk of his mistake.

Marn's belated attempt to sever his property damage claim from the Agreement on the basis of his ignorance of its contents is simply insufficient to establish a genuine issue of material fact regarding the viability of his property damage claim. Therefore, considering the policy recognizing the finality and enforceability of valid and binding settlement agreements, we hold that the circuit court correctly dismissed Marn's claims in Counts One, Three, and Four of the January 14, 1994 complaint.

### B. The Circuit Court Erred in Dismissing Appellants State Farm Fire, HBIF, and Hebert's Claims.

Appellants contend that genuine issues of material fact preclude the entry of summary judgment against them, because: (1) there was no evidence of an express agreement authorizing Marn to act on behalf of HBIF and Hebert; (2) there was no evidence of representations by HBIF, Hebert, or Marn that Marn had any authority to settle on HBIF and Hebert's behalf; and (3) the mere fact that Marn was an officer of HBIF was insufficient to establish apparent authority. Appellants also contend that there are genuine issues of material fact regarding the viability of State Farm Fire's subrogation claims. We agree and further hold that partial summary judgment should be entered in favor of HBIF, Hebert, and State Farm Fire, with respect to Marn's authority to settle on behalf of HBIF and Hebert.

#### 1. Defendants–Appellees Failed to Prove that Marn Possessed any Authority to Settle HBIF, Hebert or State Farm Fire's Claims.

 It is well established that "[a]n agency relationship may be created through actual or apparent authority." *Cho Mark Oriental Food, Ltd. v. K & K Int'l*, 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992) (citations omitted). "Actual authority exists only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent so to act, and may be created by *express agreement* or *implied from the conduct of the parties or surrounding circumstances*." *Id.* at 515–16, 836 P.2d at 1061–62 (internal quotation marks, citations, and brackets omitted) (emphases added). When reviewing an alleged agency relationship premised upon *implied authority*, "the [court's] focus is on the agent's understanding of his authority inasmuch as the relevant inquiry is whether the agent reasonably believes, because of the conduct of the principal (including acquies-

cence) communicated directly or indirectly to him, that the principal desired him so to act." *Id.* at 516, 836 P.2d at 1062 (internal quotation marks and citations omitted) (brackets added).

▮▮▮ Here, there is no evidence in the record of an *express agreement* authorizing Marn to do anything on behalf of HBIF or Hebert, let alone to prosecute claims, to enter into negotiations, or to settle on behalf of HBIF or Hebert those claims arising out of the January 19, 1992 fire. Similarly, there is no evidence of *implied authority*. The record is completely silent on Marn's alleged authority to act on behalf of Hebert, who was a resident of the HBIF building and president of HBIF, and yet the circuit court concluded that Hebert's claims "arose through" [5] Marn and that Marn had the authority to settle on his behalf. Our review of this limited record shows that there is simply no evidence that Marn possessed any authority to act on Hebert's behalf.

Nevertheless, Appellees argue that Marn's authority with respect to Hebert is irrelevant because Hebert's claim—personal to himself for property damage, as asserted in Count Two of the complaint—was disposed of through a stipulated dismissal. From what we can glean from the record, Appellees, however, ignore the fact that Hebert was a co-insured on the State Farm renter's insurance policy issued to both Hebert and Marn. Insofar as Hebert might have suffered property damage from the January 19, 1992 fire, aside from the property damage enumerated

in Count Two, the circuit court erred in dismissing Hebert's claim.

Regarding Marn's implied authority to act on behalf of HBIF, the record is likewise devoid of any representations, either by word or conduct, by HBIF or Marn to Pacific or Grimmer–Schmidt that Marn was HBIF's agent in any regard. In fact, Marn stated in his affidavit (attached to Plaintiffs' memorandum in opposition to the motions to dismiss) that he filed the original lawsuit in his individual capacity and that at no time did he represent that he was authorized to act on HBIF or Hebert's behalf. Defendants-appellees ground their entire argument in the lone fact that Marn was a corporate officer of HBIF and, therefore, that he must have executed the Agreement on HBIF's behalf.[6] However, absent any evidence of the conduct of the parties or the surrounding circumstances, there is simply insufficient support for a conclusion that Marn possessed the implied authority to execute the Agreement on HBIF's behalf. Insofar as the circuit court might have based its ruling on the principle of implied authority, the circuit court erred.

▮▮▮ The final possible basis of support for the circuit court's holding that Marn was authorized to settle HBIF and Hebert's claims is apparent authority, which

> arises when "the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he was purported to have." ... The critical focus is not on the principal and agent's inten-

---

5. Insofar as the circuit court might have concluded that HBIF and Hebert's claims arose through Marn because Marn rented the compressor, we note that it is well settled that privity of contract is not needed to bring a products liability claim. *See Stewart v. Budget Rent–A–Car Corp.*, 52 Haw. 71, 78 n. 7, 470 P.2d 240, 245 n. 7 (1970) (citing *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (Cal.1963)). "[A] manufacturer's duty of care to protect against injury from the use of its product extends only to those 'who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the [manufacturer's] conduct unreasonably dangerous.'" *Wagatsuma v. Patch*, 10 Haw.App. 547, 569–70, 879 P.2d 572, 585, *cert. denied*, 77 Hawai'i 373, 884 P.2d 1149 (1994)

(brackets in original); *see also Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 354, 944 P.2d 1279, 1297 (1997).

6. Appellees fail to deal with the fact that it was Marn who rented the compressor, presumably because the record is disputed as to whether he rented the compressor for his personal use or for HBIF renovations. Appellees do, however, argue that the following language of the Agreement implies that Marn possessed the authority to act on behalf of HBIF: "Marn and/or an agent acting on Marn's behalf rented a compressor from Pacific to be used by Marn in conjunction with painting his home[.]" In our view, no reasonable reading could support appellees' interpretation.

tion to enter into an agency relationship, but on whether a third party relies on the principal's conduct based on a reasonable belief in the existence of such a relationship.

*Cho Mark Oriental Food, Ltd.,* 73 Haw. at 516–17, 836 P.2d at 1062 (citations omitted); *see also Harris v. Waikane,* 484 F.Supp. 372, 384–85 (D.Haw.1980).

The fundamental and well-settled rule is that when, in the usual course of the business of a corporation, an officer or other agent is held out by the corporation or has been permitted to act for its or manage its affairs in such a way as to justify third persons who deal with him in inferring or assuming that he is doing an act or making a contract within the scope of his authority, the corporation is bound thereby, even though such officer or agent has not the actual authority from the corporation to do such an act or make such a contract. This authority is known as apparent or ostensible authority....

*Cosmopolitan Fin. Corp.,* 2 Haw.App. at 36, 625 P.2d at 394 (citation and footnotes omitted).

Again, there is no evidence showing that Marn was Hebert's agent in any regard; therefore, Hebert's claims were incorrectly dismissed. With respect to HBIF, the only evidence is Marn's position as an officer of HBIF and the fact that he rented the compressor. However, there is no evidence in the record that HBIF made any representations about Marn to Pacific or Grimmer–Schmidt or to any other party. Therefore, there is no reasonable basis for defendants-appellees to conclude that Marn possessed the authority to prosecute claims, to enter into negotiations, or to settle such claims on HBIF's behalf.

 Furthermore, despite defense counsel's unsubstantiated representations at the hearing on the motions that "all the elements of agency are present," the circuit court should not have ignored the conflicting evidence adduced by Marn in his affidavit, *i.e.,* that he was never authorized to act on HBIF's behalf. It is well settled that, "[w]here the facts pertaining to the existence or nonexistence of an agency are conflicting or conflicting inferences may be drawn from the evidence, those are questions of fact for the determination of the jury...." *McDonnell v. Pennington,* 40 Haw. 265, 268, *reh'g denied,* 40 Haw. 311 (1953) (citation omitted); *see also DiTullio v. Hawaiian Ins. & Guar. Co.,* 1 Haw.App. 149, 153, 616 P.2d 221, 225 (1980) (holding that extent of corporate chairman's authority constituted a genuine issue of material fact precluding summary judgment).

Based upon the record, we hold that the circuit court erred in granting summary judgment with respect to Hebert, HBIF, and State Farm Fire's claims contained within Counts One, Three, and Four. Further, insofar as the record is completely devoid of any support for a conclusion that Marn had the authority to prosecute claims, to enter into negotiations, or to execute the Agreement on behalf of Hebert or HBIF, or on behalf of State Farm Fire with respect to its subrogation claims arising through Hebert and HBIF, we vacate the circuit court's judgment and remand the matter to the circuit court with instructions to enter partial summary judgment in favor of HBIF, Hebert, and State Farm Fire on the limited issue of authority.

2. *Genuine Issues of Material Fact Remain Regarding State Farm Fire's Subrogation Rights.*

The circuit court concluded that all of State Farm's subrogation claims, with the exception of those contained within Count Two, were extinguished by Marn's settlement. Insofar as Marn lacked the authority to settle claims on behalf of HBIF and Hebert, as discussed above, it therefore follows that State Farm Fire's subrogation claims with respect to HBIF and Hebert survived. State Farm Fire's subrogation claim arising out of its renter's insurance policy with respect to Marn, however, presents an altogether different question.[7]

7. As a threshold matter, this court stated, in *First Ins. Co. of Hawaii Ltd. v. Jackson,* 67 Haw. 165, 167, 681 P.2d 569, 571 (1984), that "[i]n a classical subrogation action, the burden of proof, of

### a. An Insured May Affect Its Insurer's Subrogation Rights.

As one might guess, "subrogation plays an important role in insurance law.... When subrogation[ ] runs its course, the legally responsible third party reimburses the insurer for having paid the debt which the party owed the insured." Robert H. Jerry, II, *Understanding Insurance Law* §§ 96[a] and 96[b], at 600 (2nd ed.1996). "Subrogation is used to refer to both a legal right and a legal action. The word itself comes from the Latin 'subrogare,' which means 'to put in the place of another or to substitute.' " 4 R. Long, *The Law of Liability Insurance* § 23.01, at 23–2 (1998); *see also Taylor v. Government Employees Ins. Co.*, 90 Hawai'i 302, 310, 978 P.2d 740, 748 (Haw.1999) (citing *Shimabuku v. Montgomery Elevator Co.*, 79 Hawai'i 352, 358, 903 P.2d 48, 54 (1995)). "In the insurance field, subrogation is needed in order to preserve the principle of indemnity."

*The Law of Liability Insurance, supra,* § 23.01, at 23–3.

▇▇▇ Basically, "two different kinds of subrogation exist. 'Equitable subrogation' (sometimes called, curiously enough, 'legal' subrogation') is a principle of equity; it is effected by operation of law and arises out of a relationship that need not be contractually based.[8] 'Conventional subrogation' arises out of the contractual relationship of the parties...." [9] *Understanding Insurance Law, supra,* §§ 96[a] and 96[b], at 602–04 (footnotes and brackets added); *see also* 3 Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 44.4, at 364 (2d ed.1995 and Cum.Supp.1998); *The Law of Liability Insurance, supra,* § 23.02, at 23–5. Accordingly, "[a]n insurer which pays a claim against an insured for damages caused by the default or wrongdoing of a third party is entitled to be subrogated to the insured's rights against such third party, *irrespective of the nature of the contract ... even though the policy contains no stipulations to that*

course, is upon the party claiming subrogation to show that he is entitled to it."

8. Regarding legal or equitable subrogation, *The Law of Liability Insurance, supra,* § 23.02[2], at 23.8–13 states that

[a]n insurer's right to legal or equitable subrogation arises only when certain requirements are met. First, the insurer must have paid the loss. The right extends to the extent of the amount actually paid and the amount paid must have been paid to the insured.

In addition, the amount paid by the insurer must result in the insured's being made "whole." The general rule is that the subrogated insurer is entitled to no subrogation, or to reduced subrogation, if the result of full subrogation would be to cause the insured to be less than fully compensated for the loss, although some cases hold to the contrary....

Courts have taken three approaches to the issue of whether or not subrogation will be allowed when the insured has not been fully compensated. One approach is to find that the insurer is entitled to the full amount of its subrogation, whether or not its insured is made whole. Another is to find that the insurer is entitled to no subrogation until the insured recovers his entire loss, between the insurance payment and the recovery from the tortfeasor. The third approach is to hold that the court should make an equitable distribution of any recovery from the tortfeasor, in light of all the circumstances.

....

The second requirement for the existence of the right to legal subrogation is that the insurer must not have merely volunteered to pay the loss, but must have been required to pay based upon[, for example, operation of law or a] ... contract of insurance....

Finally, since legal subrogation is equitable in nature, the right will not be enforced unless the rights of the party seeking it are greater than the rights of others.

(Footnotes omitted.) (Brackets added.)

9. Regarding conventional or contractual subrogation, *The Law of Liability Insurance, supra,* § 23.03[1][a], at 23.18.1–18.2, and § 23.03[4], at 23–37 also states:

The right to conventional subrogation, as opposed to legal subrogation, does not depend upon principles of equity. When subrogation claimed by an insurer is based on contract, the subrogation provisions of the policy constitute the sole measure of its rights. In such a case, the insurer's rights would be subject to any limitations contained in the contract of insurance.

....

The statute of limitations for the insurer as subrogee is the same as the statute of limitations applicable to the subrogor. For example, if the subrogation claim is based on tort, the tort statute of limitations will apply....

(Footnotes omitted.) Therefore, principles of equity may apply to a payment made pursuant to a contract. Any subrogation terms written into that contract, however, will govern.

*effect.*" 8B John A. Appleman and Jean Appleman, *Insurance Law and Practice* § 4941, at 31–38 (1981) (*Appleman on Insurance*) (emphases added); *see also Taylor*, at 310, 978 P.2d at 748.

Because

subrogation involves "stepping into" the shoes of another, when an insurer brings an action against a tortfeasor based upon its subrogation rights, the insurer's rights flow from the insured's rights. The subrogated insurer, known as the "subrogee," can be subrogated to and enforce only such rights as the insured, known as the "subrogor," has against the party whose wrong caused the loss. In a subrogation suit, a tortfeasor may assert against the insurer any defense which the tortfeasor could have asserted against the insured.

*The Law of Liability Insurance, supra,* § 23.03[2], at 23–13 to 23–14. Therefore, the general rule provides that an insured may affect its insurer's subrogation rights because they are derivative, *i.e.*, the insurer's subrogation rights rest upon the viability of the insured's claim against the tortfeasor. *Id.* § 23.04[1], at 23–40. "One of the possible defenses is a waiver or release by the insured. If the insured waives its right to bring an action against the tortfeasor, then the insurer is barred from bringing a subrogation action." *Id.*[10] Most insurance policies, however, contain a provision prohibiting an insured from prejudicing "the insurer's subrogation right. A violation of this provision will, in most cases, enable the insurer to deny the insured's claim if it has not already paid it or to recover its money back from the insured if it has already paid." *The Law of Liability Insurance, supra,* § 23.04, at 23–

40; *cf. Taylor*, at 309–310, 978 P.2d at 747–748 (upholding consent-to-settle clauses in underinsured motorist context while recognizing insurers' duty to act in good faith). Thus, one avenue of reimbursement for the insurance company lies with its insured.

■ A second avenue of reimbursement for the insurer, however, may lie with the tortfeasor. Generally speaking,

if an insured settles with and releases the tortfeasor from liability before the insurer pays the loss under the terms of the policy, the insurer cannot enforce its right to subrogation against the tortfeasor when it does pay the claim, *unless it can prove that the tortfeasor knew of the insurer's right of reimbursement or can prove collusion between the insured and the tortfeasor in an attempt to defeat the insurer's right.* The insurer will, however, have the right to deny the insured's claim on the basis that it violated the contract of insurance since it did prejudice the insurer's subrogation right. If the insured settles with and releases the tortfeasor after payment is made by the insurer, the insurer is entitled to seek reimbursement from the insured.

*The general rule applies when the tortfeasor does not know of the existence of the subrogation claim.* If the tortfeasor or its liability insurer knows of the subrogation claim and settles with the insured, without protecting the insurer's subrogation claim, *the release given by the insured does not bar the subrogation claim.* The subrogated insurer can still recover from the tortfeasor.

. . . .

**10.** *See also Taylor*, at 310, 978 P.2d at 748 (citing *Longworth v. Van Houten*, 223 N.J.Super. 174, 538 A.2d 414, 419 (App.Div.1988) (stating that insured's giving release to tortfeasor extinguishes UIM carrier's right of subrogation against tortfeasor)); *Great Northern Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 291 Minn. 97, 189 N.W.2d 404 (1971) (holding insurer's subrogation rights defeated by settlement before and after payment on insurance policy); *Weinberg v. Transamerica Ins. Co.*, 62 N.Y.2d 379, 477 N.Y.S.2d 99, 465 N.E.2d 819 (1984) (holding insurer's subrogation rights prejudiced unless insured expressly preserves in-

surer's subrogation rights in settlement); *Hill v. State Farm Mut. Auto. Ins. Co.*, 765 P.2d 864 (Utah 1988) (holding insurer's subrogation rights destroyed by insured's release with insolvent tortfeasor); *see generally AIG Hawaii Ins. Co., Inc. v. Rutledge*, 87 Hawai'i 337, 345–46, 955 P.2d 1069, 1077–78 (App.1998) (holding that an insurer should be entitled to recoup its payments from the insured where the insured has been fully indemnified and, in fact, might have received a double recovery); 6B *Appleman on Insurance, supra,* § 4092, at 239, and § 4092, at 159 (Supp.1998).

The basis of the right the subrogated insurer has to reimbursement if the insured settles and destroys its subrogation right appears to be that the insurer is prejudiced when it had no knowledge of the settlement. Surprisingly, there is relatively little law concerning whether the insurer must prove that it was prejudiced, that is, that it could have recovered on the claim, had the insured not settled with the tortfeasor. If the insurer could not have recovered, it is not prejudiced[11] and has no claim or defense against its insured. *Id.* § 23.04[1], at 23–41 to 23–42 (emphasis added) (some footnotes omitted and some added). *See also* 6A *Appleman on Insurance, supra,* § 4092, at 244 ("Another line of authority ... supports the view that a release by the insured to a wrongdoer whose negligence caused the loss does not destroy the insurer's subrogation rights" where the tortfeasor has knowledge of the insurer's subrogation right.); *Gibbs v. Hawaiian Eugenia Corp.,* 966 F.2d 101, 107 (2d Cir. 1992) ("Where a third party obtains a release from an insured with knowledge that the latter has already received payment from the insurer or with information that, reasonably pursued, should give him knowledge of the existence of the insurer's subrogation rights, such a release does not bar the right of subrogation of the insurer."); *National Ins. Underwriters v. Piper Aircraft Corp.,* 595 F.2d 546, 551 (10th Cir.1979) (noting that the "typical solution" is that a release executed with knowledge of the insurer's subrogation rights does not necessarily bar the insurer from asserting those rights); *Miller v. Auto-Owners Ins. Co.,* 392 So.2d 1201, 1203 (Ala. Ct.App.1981) (holding that litigation to enforce insurer's subrogation claim was sufficient notice to render tortfeasor's settlement ineffective against insurer); *Vigilant Ins. Co. v. Bowman,* 128 Ga.App. 872, 198 S.E.2d 346, 347–48 (1973) (holding that release did not defeat insurer's subrogation rights where wrongdoer had actual notice); *Employers*

*Mut. Cas. Co. v. Meggs,* 229 So.2d 823, 824 (Miss.1969) (holding dismissal improper where circumstantial evidence shows tortfeasor had knowledge of insurer's subrogation rights prior to settlement); *Aetna Ins. Co. v. Gilchrist Bros.,* 85 N.J. 550, 428 A.2d 1254, 1259 (1981) (holding that general release with insured's estate did not affect insurer's subrogation rights when tortfeasor had knowledge through correspondence with insurer), *superseded by statute* N.J.S.A. 39:6A–9.1 (conferring primary right of reimbursement to the no-fault insurance carrier regardless of tortfeasor's knowledge); *Scavone v. Kings Craft Corp.,* 55 A.D.2d 807, 390 N.Y.S.2d 20, 20 (1976) (holding that insurer's subrogation rights were not extinguished by release that failed to include subrogated economic loss); *Southern Pac. Transp. Co. v. State Farm Mut. Ins. Co.,* 480 S.W.2d 59, 63–64 (Tex.Ct. App.1972) (holding insurer not barred from recovery under either doctrine of res judicata or of splitting causes of action where tortfeasor had knowledge of insurer's subrogation claim).

Therefore, we hold that, in the context of fire and casualty insurance, if the insurer proves (1) that the tortfeasor had actual or constructive knowledge of the insurer's subrogation right of reimbursement or that the tortfeasor and insured colluded to destroy the insurer's subrogation right and (2) that the insurer's subrogation right of reimbursement is actually prejudiced by the insured's release of the tortfeasor, then the insurer may maintain a subrogation action against the tortfeasor. In other words, the insured's release of the tortfeasor will not affect the insurer's subrogation right of reimbursement when the tortfeasor acts inequitably and causes actual prejudice to the insurer.

Our decision today finds further support in this court's decisions that have preserved subrogation rights from third-party settlement in a number of analogous cases ad-

---

11. "We adopt the view, held by many courts, that the legitimate invocation of a consent-to-settle provision 'requires the insurer to demonstrate prejudice from the insured's failure to obtain the insurer's consent before settling with the tortfeasor.' " · *Taylor,* at 311, 978 P.2d at 749 (quoting *Greenvall v. Maine Mut. Fire Ins. Co.,* 715 A.2d

949, 954 (Me.1998), and citing *Galinko v. Aetna Cas. and Sur. Co.,* 432 So.2d 179 (Fla.Dist.Ct. App.1983); *MacInnis v. Aetna Life & Cas. Co.,* 403 Mass. 220, 526 N.E.2d 1255 (1988); *Sorensen v. Farmers Ins. Exch.,* 279 Mont. 291, 927 P.2d 1002 (1996)). We hold that the prejudice requirement applies here as well.

dressing statutorily-protected subrogation rights. For example, in *Peters v. Weatherwax*, 69 Haw. 21, 27, 731 P.2d 157, 161–62 (1987), this court interpreted a statutory provision that stated that "[t]he department shall as to this right be subrogated to any right or claim [that] a claimant ... has against [the] third person[.]" *Id.* at 26, 731 P.2d at 161 (brackets added). The statute did not define the term "subrogated," and, therefore, the *Peters* court turned to the common law for guidance regarding its definition. In so doing, the *Peters* court stated:

Subrogation is a venerable creature of equity jurisprudence, "so administered as to secure real and essential justice without regard to form[.]" H. Sheldon, *The Law of Subrogation* § 1, at 2 (1882) (footnote omitted). "It is broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which, equity and good conscience, should have been discharged by the latter[.]" *Id.* (footnote omitted). It "is defined by Sheldon to be 'the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt.'" *Kapena v. Kaleleonalani*, 6 Haw. 579, 583 (1885). When subrogation occurs, "[t]he substitute is put in all respects in the place of the party to whose rights he is subrogated." *Id.* In effect, he "steps into the shoes" of the party. *See Putnam v. Commissioner*, 352 U.S. 82, 85, 77 S.Ct. 175, 176, 1 L.Ed.2d 144 (1956); A. Windt, *Insurance Claims and Disputes* § 10.05, at 409 (1982); *Black's Law Dictionary* 1279 (5th ed.1979).

. . . .

... Furthermore, "[a]lthough, as between debtor and creditor, the debt may be extinguished, yet, as between the person who has paid the debt and the other parties, the debt is kept alive [by the doctrine of subrogation], so far as may be necessary to preserve the securities." H. Sheldon, *supra*, § 11, at 10 (footnote omitted).

*When "the legislature enacts into statute law a common law concept, ... that is a clue that the courts are to interpret [and apply] the statute with the freedom with which they would construe and apply a common law principle[.]"* Posner, *Statutory Interpretation—in the Classroom and in the Courtroom*, 50 U.Chi.L.Rev. 800, 818 (1983). Under the concept borrowed from the common law here, *a court "may give restitution ... and prevent the unjust enrichment*[12] *of the defendant, where the plaintiff's property has been used in discharging an obligation owed by the defendant[.]"* *Restatement of Restitution* § 162 comment a (1937). *Unjust enrichment in this instance could only be prevented if the State is allowed to assert its claim for special damages.* Otherwise, the defendants may have discharged their tort liability for less than what was just in the circumstances at the expense of the State; and it would then be unjust for them to retain the benefit of the State's assumption of the obligation to pay the accident victim's medical bills.

*Id.* at 27, 29, 731 P.2d at 161, 162 (emphases and footnote added) (some brackets added and some in original). Applying principles of common law and equity,[13] the *Peters* court weighed the State's statutory subrogation rights against the tortfeasor's contractual release rights and held that a recipient of state medical assistance lacked the capacity to waive the State's subrogation rights through a settlement or release agreement with the tortfeasor.

*Alamida v. Wilson*, 53 Haw. 398, 404, 495 P.2d 585, 590 (1972) (quoting *Restatement of Restitution* § 162) (emphases added).

**12.** This court has also stated regarding equitable principles of restitution that:

Where property of one person is used in discharging an obligation owed by another·or a lien upon the property of another, under such circumstances that the other would be *unjustly enriched* by the retention of the benefit thus conferred, the former is *entitled to be subrogated* to the position of the obligee or lienholder.

**13.** The *Peters* court also explained that, "[w]hen we speak of the 'common law,' we are, of course, using the term in a broad sense and referring to the non-statutory component of our laws, which has been described as 'the general system of common law and equity.'" *Id.* at 27 n. 7, 731 P.2d at 161 n. 7 (citations omitted).

Similarly, in *Grain Dealers Mutual Insurance Company v. Pacific Insurance Company Ltd.*, 70 Haw. 211, 217, 768 P.2d 226, 229–30 (1989), this court addressed subrogation rights created by a no-fault insurance policy and enforced through statute. The *Grain Dealers* court explained that "neither the legislative history nor the scheme of the no-fault statute suggests that the legislature, in using the term 'subrogation' in [HRS] § 294–7, did not intend to encompass the common law concept of subrogation wherein the party who paid the debt pursues its subrogated claims against the tortfeasor/debtor." *Id.* at 216, 768 P.2d at 229 (brackets added). Once again, applying principles of equity, this court held that "Grain Dealers is subrogated to any rights or claims which [the insured] has against the tortfeasors . . ., and as to these rights, [the insured] was without authority to effectuate a waiver." *Id.* (brackets added).

In *Pacific Insurance Company, Ltd. v. Esperanza,* 73 Haw. 403, 833 P.2d 890 (1992), a case involving temporary disability insurance, this court reaffirmed its distaste for a tortfeasor's unjust enrichment. In *Pacific,* 73 Haw. at 404, 833 P.2d at 891, the insurer attempted to recover its disability payments from Esperanza, the insured, who had settled with the tortfeasor's insurer for general damages of $52,500.00. This court held that Pacific could recover from the insured the amount of lost wages, if any, included in the settlement and distinguished *Peters v. Weatherwax* on the basis that the "unjust enrichment that the *Peters* court referred to was that of the [tortfeasor], not [the insured]." *Id.* at 408, 833 P.2d at 893 (brackets added). The *Pacific* court, however, did not disavow the *Peters* principle that the assistance recipient or the insured lacked the authority to compromise the insurer's subrogation rights.

Furthermore, in *Shimabuku,* 79 Hawai'i at 354–55, 903 P.2d at 50–51, this court addressed subrogation in the statutory context of worker's compensation. Shimabuku stipulated to dismiss his claims against Montgomery, in essence releasing Montgomery for injuries incurred during the scope of Shimabuku's employment, without his employer's permission or acquiescence. Relying upon *Peters v. Weatherwax, supra,* and *Kapena v. Kaleleonalani, supra,* the *Shimabuku* court determined that an employer's subrogation rights under Hawai'i Revised Statutes (HRS) § 386–8 (1985)[14] outweighed the insured and the tortfeasor's interests in the finality of their settlement. *Id.* at 358, 903 P.2d at 54. The court held that the stipulation contravened the employer's statutory subrogation interest. Finally, in *dictum,* the *Shimabuku* court focused upon the fact that the tortfeasor knew or reasonably should have known of the insurer's subrogation interests. *Id.* at 359, 903 P.2d at 55.

■ Weighing the policy considerations underlying an insurer's right of subrogation against those considerations supporting the finality of settlement, as discussed *infra,* we hold, in the context of fire and casualty insurance, that the insurer may have a second avenue of reimbursement (in addition to contractual remedies against the insured for a breach of the insurance contract), in order to recover a total amount limited to the benefits *actually paid* to its insured. We hold that, if the insurer proves (1) that the tortfeasor had actual or constructive knowledge of the insurer's subrogation right of reimbursement or that the tortfeasor and insured colluded to destroy the insurer's subrogation right and (2) that the insurer's subrogation right of reimbursement is actually prejudiced by the insured's release of the tortfeasor, then the release, settlement, and/or indemnification agreement executed by the insured and the tortfeasor will not bar a subrogation action by the insurer against the tortfeasor.

14. HRS § 386–8 provided in relevant part that [w]hen a work injury for which compensation is payable under this chapter has been sustained under circumstances creating in some person other than the employer . . . a legal liability to pay damages on account thereof, the injured employee or his dependents . . . may claim compensation under this chapter and recover damages from such third person.

. . . .

No release or settlement of any claim or action under this section is valid without the written consent of both employer and employee.

■ Equity simply does not support the conclusion that the insurer, which has per-formed its contractual obligations under the policy in good faith, should be forced to *unjustly* enrich a tortfeasor who attempted to settle a claim with knowledge of the insurer's subrogation claim. Where the insurer's subrogation right clashes with the tortfeasor's contractual release right, the insurer's subrogation right will prevail if the tortfeasor acted inequitably.[15]

■ Therefore, based upon the foregoing, the circuit court erred in dismissing State Farm Fire's subrogation claim arising through its payment to Marn on the renter's insurance policy because there remain genuine issues of material fact precluding summary judgment, *e.g.*, whether Marn's renter's policy with State Farm contained a provision prohibiting compromise of its subrogation rights or whether defendants-appellees Pacific and Grimmer–Schmidt knew that State Farm Fire already made payments to Marn under the renter's insurance policy.

b. *An Insurer May Affect Its Own Subrogation Rights.*

In addition to the actions of an insured, "[a]n insurer may relinquish its subrogation rights, either knowingly or unknowingly. It may do this expressly by waiving its right to subrogation or by engaging in conduct inconsistent with its exercise of its subrogation right. Thus, an insurer's failure to assert its subrogation right may be construed as a waiver." *The Law of Liability Insurance, supra*, § 23.04[2], at 23–45 to 23–46.

■ In this context, we deem the *Grain Dealers* court's discussion regarding the in-surer's responsibility to exercise reasonable diligence in protecting its subrogation rights apposite and persuasive. The *Grain Dealers* court stated:

This right of subrogation ... is not absolute.... *Equitable principles dictate that the subrogee exercise reasonable diligence to protect its subrogation interest. Consolidation Coal Co., Inc. v. Liberty Mutual Ins. Co.*, 406 F.Supp. 1292, 1301 (W.D.Pa.1976); *Travelers Insurance Co. v. Hartford Accident & Indemnity Co.*, 222 Pa.Super. 546, 550, 294 A.2d 913, 915 (1972); *Baker v. Fargo Building & Loan Ass'n*, 64 N.D. 317, 252 N.W. 42 (1934).

In a case falling within the ambit of HRS § 294–7, we hold that "reasonable diligence" requires at least that the no-fault insurer which claims subrogation rights give timely and reasonable notice of its claim to the tortfeasor and the tortfeasor's insurer. In the instant case, the record clearly indicates that Grain Dealers gave timely and reasonable notice to Pacific Insurance of its subrogation claim for fifty percent of no-fault benefits paid to [the insured].

*Id.* at 217–18, 768 P.2d at 230 (brackets and emphasis added); *see also Taylor*, at 311, 978 P.2d at 749 (citing *Grain Dealers* ). HRS § 663–10 (1993)[16] provides further support for an equitable requirement of diligence, insofar as it provides protection for an insurer that exercises due diligence by filing a timely notice of its claim. Therefore, we hold that an insurer may waive its subrogation right either expressly or impliedly.[17]

■ Applying the above mentioned to the instant case, we also hold that a genuine

---

**15.** Although we do not decide conclusively at this time whether the instant case involved collusion or fraud, it is worthy of note that the instant Settlement Agreement included the following "nondisclosure" provision: "MARN agrees and acknowledges that he will not divulge any terms of this Settlement Agreement with any entity, including but not limited to his heirs, executors, administrators, agents, *subrogees*, successors and assigns...." (Emphasis added.)

**16.** HRS § 663–10 provides:

**Collateral sources; protection for liens and rights of subrogation.** In any civil action in tort, the court, before any judgment or stipula-tion to dismiss the action is approved, shall determine the validity of any claim of a lien against the amount of the judgment or settlement by any person who files timely notice of the claim to the court or to the parties in the action. The judgment entered, or the order subsequent to settlement, shall include a statement of the amounts, if any, due and owing to any person determined by the court to be a holder of a valid lien and to be paid to the lienholder out of the amount of the corresponding special damages recovered by the judgment or settlement[.]

**17.** We note that any existing statutory time limits regarding subrogation rights would control.

issue of material fact remains as to whether State Farm Fire exercised due diligence in asserting its subrogation rights.

IV. *CONCLUSION*

Based upon the foregoing, we affirm in part and vacate in part the circuit court's first amended final judgment, filed on April 30, 1996. In light of the December 7, 1993 Settlement Agreement and Joint Tortfeasor Release, we affirm the circuit court's judgment effectively granting partial summary judgment in favor of defendants-appellees Pacific and Grimmer–Schmidt and against Marn on all counts regarding his property damage claim. However, insofar as there was insufficient evidence to support the circuit court's conclusion that Marn possessed the authority to settle any claims on behalf of HBIF or Hebert, and, consequently, to settle State Farm Fire's subrogation claims as to HBIF and Hebert, we reverse the circuit court's grant of partial summary judgment in favor of defendants-appellees. We remand the matter with instructions for the circuit court to enter partial summary judgment in favor of HBIF, Hebert, and State Farm Fire on the limited issue of authority. Finally, because there are genuine issues of material fact with respect to State Farm Fire's subrogation rights as to Marn, we also vacate the circuit court's judgment in this regard and remand the matter to the circuit court for further proceedings consistent with this opinion.